**UNITED STATES, Appellee,**

v.

**Glenn M. SNIPES, Staff Sergeant, U.S. Air Force, Appellant.**

No. 44,188.
ACM 23330.

U.S. Court of Military Appeals.

July 2, 1984.

For Appellant: *Major William H. Lamb* (argued); *Colonel George R. Stevens* (on brief).

For Appellee: *Captain Brenda J. Hollis* (argued); *Colonel Kenneth R. Rengert, Major George D. Cato,* and *Captain Kathleen A. McGah* (on brief).

*Opinion of the Court*

COOK, Senior Judge:

The accused was tried by general court-martial, military judge alone, for committing indecent, lewd, and lascivious acts on "J.S.," his adopted daughter and a female under the age of 16, with the intent to gratify his sexual desires; and for committing sodomy with "J.S." [hereinafter referred to as the victim], in violation of Articles 134 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 925, respectively. He was found not guilty of sodomy, but despite his pleas, he was found guilty of committing certain indecent, lewd, and lascivious acts. He was sentenced to a bad-conduct discharge, confinement at hard labor for 9 months, forfeiture of $371.00 pay per month for 9 months, and reduction to the pay grade of E–2. The convening authority approved the sentence as adjudged and directed confinement at the 3320th Correction and Rehabilitation Squadron, Lowry Air Force Base, Colorado. We granted accused's petition for review of two issues.

I

WHETHER THE RULE IN *UNITED STATES V. MAYBURY*, 274 F.2d 899 (2d Cir. 1960) PROHIBITING INCONSISTENT FINDINGS IN A JUDGE ALONE TRIAL SHOULD BE FOLLOWED IN THE MILITARY.

The "rule" in *United States v. Maybury*, 274 F.2d 899 (2d Cir. 1960), had a rather inauspicious beginning. Maybury was indicted on two counts involving a treasury check made payable to Abraham Kohl. The first count alleged that Maybury had forged Kohl's signature on the endorsement side of the check for the purpose of obtaining money. The second count alleged that Maybury had uttered the check, knowing that the endorsement had been forged, with the intent to defraud the Government. Maybury waived a jury trial and was tried before Judge Abruzzo alone. For reasons not clearly set forth in the record, Judge Abruzzo acquitted Maybury of the forgery charge, but convicted him of uttering the check knowing it to be forged. Maybury appealed, asserting insufficiency of the evidence and inconsistency of the acquittal of forgery with the conviction of uttering a forged check with knowledge of the forgery. The appeal was heard by Chief Judge Lumbard, Senior Judge Learned Hand, and Judge Friendly.

All the judges agreed that the evidence was sufficient to convict Maybury of both charges. The Government contended that inconsistent jury verdicts had been upheld previously and that the same rationale should apply in a trial before a judge as the fact-finder. *See Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) [1]; *Steckler v. United States*, 7

1. In *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), the Court stated:
Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. [Citations omitted.] If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold. ...

F.2d 59 (2d Cir. 1925). However, Judge Friendly and Chief Judge Lumbard held that the verdict was inconsistent and remedial action was required. Judge Friendly would have reversed and remanded for trial on both charges, but Chief Judge Lumbard believed that the inconsistency required dismissal of both charges.

Senior Judge Learned Hand, who had written the *Steckler*[2] opinion some 35 years earlier, offered a different approach, as follows:

> I do not see why the conviction on Count 2 should be reversed, however erroneous was the acquittal on Count 1, unless there was some inconsistency in the findings upon one of the facts constituting the crime charged in Count 1 and upon the same fact constituting the crime charged in Count 2. The reason for reversing the conviction in that event would be that we could not know what the judge found as to the fact common to the two crimes. I do not see why otherwise a person should escape punishment for a crime of which he is found guilty, because he was acquitted of another crime

of which he was also guilty. Consistency in the application of the law is not an interest which the accused may invoke, unless it operates to his disadvantage, which by hypothesis would not then be true. We should not exculpate him in order to prevent errors in judicial dialectic.

> In the case at bar even if the judge found that Maybury had *not* endorsed the check when he entered the judgment of acquittal, and that he *had* endorsed it when he entered judgment of conviction, I should not agree that the conviction could not stand, unless it appeared that he had relied upon Maybury's endorsement as a necessary fact in determining to convict. It is impossible to know what he did find as to the endorsement.

However, in order to resolve the impasse, Judge Hand was "willing to go along with Judge FRIENDLY" in reversing the conviction and ordering a new trial as to the second charge. *Id.*, 274 F.2d at 908.

The *per se* application of the "rule"[3] in *United States v. Maybury, supra,* has not been widely endorsed. *See United States*

---

That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.
*Id.* at 393–94, 52 S.Ct. at 190–91.

2. In *Dunn v. United States, supra* at 393, 52 S.Ct. at 190. *Steckler v. United States,* 7 F.2d 59 (2d Cir. 1925), was quoted as follows:
   "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

3. In *United States v. Maybury,* 274 F.2d 899 (2d Cir. 1960), Circuit Judge FRIENDLY disclaimed "any desire of *elegantia juris*" and based his decision on this logic:
   [W]e can have no confidence in a judgment convicting Maybury of one crime when the judge, by his acquittal of another, appears to have rejected the only evidence that would support the conviction here.
   *Id.* at 905. However, compare the following from *Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981):

We are not persuaded that an apparent inconsistency in a trial judge's verdict gives rise to an inference of irregularity in his finding of guilt that is sufficiently strong to overcome the well-established presumption that the judge adhered to basic rules of procedure.

    \*    \*    \*    \*    \*    \*

It is also possible that the judge may have made an error of law ... There is no reason—and surely no constitutional requirement—that such an error pertaining to the case against Robinson should redound to the benefit of respondent.

Even the unlikely possibility that the acquittal is the product of a lenity that judges are free to exercise at the time of sentencing but generally are forbidden to exercise when ruling on guilt or innocence, would not create a constitutional violation. ... The Constitution does not prohibit state judges from being excessively lenient.
*Id.* at 346–48, 102 S.Ct. at 465 (footnotes omitted). *Rivera* is not squarely on point as it involves inconsistency in conviction and acquittal of multiple defendants. However, it does represent a concern for the guilty verdict which is supported by evidence beyond a reasonable doubt. *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980); *cf. United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

*v. West*, 549 F.2d 545 (8th Cir. 1977), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977); Annot., 18 A.L.R.3d 259, 284 (1968). We decline to adopt it into the military justice system, preferring, instead, to look at the specification upon which a guilty finding has been made to determine whether it may legally stand.[4]

In the case at bar, the accused was convicted, by exceptions and substitutions, of the first specification under Charge I, and the military judge fashioned a second specification under Charge I in order to include the excepted words.

### ORIGINAL CHARGES

CHARGE I: Violation of the Uniform Code of Military Justice, Article 134.

Specification: In that STAFF SERGEANT GLENN M. SNIPES, United States Air Force, 56th Transportation Squadron, did, at 669F Kenwere Loop, MacDill AFB, Florida, at divers times between 1 July 1980 and 18 December 1980, commit indecent, lewd and lascivious acts upon the body of ... [J.S.], a female under the age of sixteen years, *by placing a finger inside her vagina and rubbing her breasts,* and by placing his hands upon her back, her legs, and her buttocks, with the intent to gratify the sexual desires of the said Staff Sergeant Glenn M. Snipes.

> [Italicized words excepted by M.J.]

CHARGE II: Violation of the Uniform Code of Military Justice, Article 125.

Specification: In that ... SNIPES, ... did, ... commit sodomy with ... [J.S.], a child under the age of sixteen years.

### FINDINGS OF THE MJ

Of Charge I: Guilty.

Of the Specification, Charge I: Guilty, except the words "by placing a finger inside her vagina and rubbing her breasts."

... Guilty of the ... [Additional] Specification fashioned [by MJ] out of the excepted words:

In that Staff Sergeant ... Snipes, ... did, ... at divers times between 1 July 1980 and 18 December 1980, commit indecent, lewd and lascivious acts upon the body of ... [J.S.] *by placing a hand on her vagina and rubbing her breasts.*

> [Italicized words replace excepted words.]

Of the Specification of Charge II and of Charge II: Not guilty.

---

He found the accused not guilty of sodomy. Examination and comparison of the elements of the offense of indecent acts with those of sodomy show that they are completely separate offenses. *See* paras. 213*f*(3) and 204 Manual for Courts-Martial, United States, 1969 (Revised edition). Hence, conviction of one and acquittal of the other is neither legally nor factually inconsistent. *See United States v. Wilson,* 13 M.J. 247 (C.M.A. 1982). Inconsistency can be asserted only by accepting appellate defense counsel's argument that the victim was the sole source of the evidence against

accused, and, since she testified to the events underlying both charges, the military judge's findings reflect that he believed part of her story, but disbelieved other parts. We do not choose to indulge in such supposition. *United States v. Wilson, supra.*

■ There is no question that "the fact-finders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris,* 8 M.J. 52, 59 (C.M.A. 1979). However, even beyond this truism, there is an obvious rational basis for the judge's findings.[5] The accused's own

---

**4.** We have already rejected the concept that acquittal of one co-conspirator (A) in a separate trial necessarily mandates the acquittal of the other (B) where the evidence establishes B's complicity beyond a reasonable doubt. *United States v. Garcia,* 16 M.J. 52 (C.M.A. 1983). Furthermore, "[a]n inconsistent verdict is not usually a cause for relief," since "the court-martial

may merely have given the accused 'a break.'" *United States v. Lyon,* 15 U.S.C.M.A. 307, 313, 35 C.M.R. 279, 285 (1965).

**5.** In *Arizona v. Washington,* 434 U.S. 497, 517, 98 S.Ct. 824, 836, 54 L.Ed.2d 717 (1978), the Supreme Court found:

statement admitted performing all of the acts that were found in the original and tailored specifications. Of course, he gave exculpatory explanations. The military judge obviously accepted the victim's testimony as to the accused's lustful intentions when he placed his hands on her back, her legs, and her buttocks, and his decision was bolstered by the accused's own admission that he had had an erection during some of these occasions. In the tailored specification, the military judge accepted the accused's admission that he had placed his hand on the victim's vagina and rubbed her breasts, but, he found that these acts were indecent nonetheless.[6] To put it another way, the military judge gave less weight to the testimony of the victim that was not corroborated by other evidence. Certainly, that was well within his discretion as the person who saw the witnesses, heard the testimony, and reviewed the evidence. *United States v. Wilson, supra* ; *United States v. Carmichael*, 21 U.S.C.M.A. 530, 45 C.M.R. 304 (1972); *United States v. Montgomery*, 20 U.S.C.M.A. 35, 42 C.M.R. 227 (1970).

## II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ALLOWING GOVERNMENT REBUTTAL IN WHICH WITNESSES COMPARED THE INSTANT CASE TO OTHERS INVOLVING SUSPECTED CHILD ABUSE.

As in most child molesting cases, the crucial issue for the factfinder was the credibility of the victim. The thrust of the defense case was an attack on the victim's truthfulness. The defense called Dr. Maria Martinroe, a clinical-psychologist consultant of the State of Florida, who was accepted as an expert in child psychology, and who had examined the victim for the purpose of placing her in a foster home. Dr. Martinroe testified as to the results of her examination of the victim and her diagnosis of the victim's personality. As part of this testimony, Dr. Martinroe gave examples of particular traits of similarly diagnosed children, including their propensity to tell falsehoods and to make sexual accusations as a manifestation of revenge. She also testified as to the family pattern of the sexually abused child. Defense counsel asked specifically:

> Now, this pattern of behavior and ... [the victim's] pattern of behavior, can you draw a conclusion from that as to whether or not the acts of incest or sexual molestation actually did or did not happen?

After objection that such a question went to the ultimate issue in the case, the military judge permitted the witness to give her opinion:

> On the basis of my interview with her, I don't know if she's telling the truth or not.

The defense then called the wife of a neighbor of the accused who testified as to the victim's reputation for truth; the accused's mother, who testified as to her knowledge of the victim; and the natural mother of the victim, who was divorced

---

Review of any trial court decision is, of course, facilitated by findings and by an explanation of the reasons supporting the decision. No matter how desirable such procedural assistance may be, it is not constitutionally mandated in a case such as this.

**6.** Dr. Martinroe's report states, in part:

Whatever the facts may be, knowledge of children's and adolescent's emotional and sexual development argues strongly against fathers touching girl's breasts or massaging their backs, most particularly in adolescence. There are normally sexual feelings between fathers or stepfathers and daughters. ... In placing a teenage girl alone with her stepfather often arouses sexual feelings in both. When there is further and concrete sexualizing of this relationship (the inevitable effect of touching her breasts and massaging her back whatever was the underlying reason) then the relationship becomes a destructive one. ... In ... [the victim's] situation there is not only the sexualizing of the relationship to the stepfather but in addition the lack of basic trust and bonding to the mother and father.

Dr. Samek also speaks of "the sexualizing of the relationship."

from the accused. In general, all testified to specific instances of conduct of the victim indicative of untruthfulness.[7]

In rebuttal, the Government called the wife of the victim's natural father, in whose home she had been placed by the State of Florida. This witness testified about her experiences with the victim and with regard to her opinion of the victim's truthfulness.[8] The Government also called the victim's natural father, who testified in a similar manner, although qualifying his opinion by the fact that he had had only limited contact with the victim for the 10 years prior to the last 6 months.

The Government then called three witnesses who worked for the Florida Department of Health and Rehabilitative Services who had had direct professional relations with the victim following disclosure of her allegations against the accused.

The first witness, a social worker, had been directed to do a home study of the victim's natural father for the purpose of placing her in his custody, and to supervise the victim after placement. She testified that, based upon her continuing contacts with the victim, she believed the victim was a truthful person. She also compared the victim's personality to the personalities of other sexually abused children. She had not discussed the specific allegations regarding sexual misconduct with the victim although she was aware of them from other sources. She opined that, in this case, there could be no other explanation for the victim's personality except sexual abuse.

The second witness was the District Intake Counselor of the Florida Department of Health and Rehabilitative Services. She initiated an investigation following receipt of the report of the victim's abuse and filed the judicial papers for the detention hearing. She testified that she, herself, had interviewed and had observed others interview the victim. Based on these contacts,

she opined that the victim had made truthful statements. She also related her opinion to her experience with other cases of reported child abuse.

The third witness called by the Government appeared as an expert in clinical and forensic psychology and sex offenses. After being so accepted by the military judge, he testified at some length about the characteristics of the incest-family's interrelations. He then related this background specifically to the victim, based upon some 31 interviews with her for treatment occurring after the reported abuse. Based upon his own experience and his contacts with the victim, he opined that she was truthful in her allegations and that "her personality and her mental state ... [were] consistent with having been sexually abused." Perhaps most damaging was his testimony on cross-examination:

A. I have not known of any cases where a child has accused a parent of incest where it has not been so.

Q. But surely there are some cases.

A. I'm not sure. I know other professions who say, "No." I'm not convinced that it never happens. Never is a strong word. I think it's rare.

Several observations stand out from this expert and "quasi-expert" testimony. First, all of the witnesses skirt the "ultimate issue" in giving their opinions as to the victim's reputation for truthfulness. Second, the "door was opened" by the defense with their first witness. Third, there was no objection from defense counsel to this type of testimony, although there were some specific objections to questions.

The pertinent Military Rules of Evidence are:

Rule 702. Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

---

7. These witnesses did give "opinions" in certain instances, but such testimony is permitted by Mil.R.Evid. 701 when it is "(a) rationally based on the perception of the witness and (b) helpful

to a clear understanding of the testimony of the witness or the determination of a fact in issue."

8. This witness had two degrees in counseling and worked for the state as a counselor.

fied as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703. Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert, at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 704. Opinion on Ultimate Issue

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Rule 705. Disclosure of Facts or Data Underlying Expert Opinion

The expert may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data, unless the military judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Manual, *supra.*

▮▮▮ When these rules are read in combination, the conclusion is inescapable that they are intended to broaden the admissibility of expert testimony, and that the essential limiting parameter is whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Appendix 18, Analysis of Rule 701, Manual, *supra*; S. Saltzburg, L. Schinasi, and D. Schleuter, *Military Rules of Evidence Manual* 324 (1981).[9] Whether the particular testimony or evidence falls within this standard is a matter within the discretion of the military judge. Analysis, *supra*; *see also* Fed.R.Evid. 104–105.

In cases of child abuse or incest,[10] the knowledge of even a very experienced trial judge may be limited as to the psyche of the child victim, and expert testimony as to recorded experiences of psychologists in similar and related cases can help the factfinder in evaluating the behavior of the child, particularly when the contrary allegation is that she lied about the incidents or made them up in retaliation for some family difficulty. In a case factually similar to the case at bar, the Oregon Supreme Court permitted expert testimony by social workers that compared the behavior of the victim to the behavior of other children who had reported being raped by family members. *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983). We note that the applicable Oregon rules of evidence are the same as Military and Federal Rules 702 and 704. The Oregon court held:

We recognize that sexual abuse of children is a problem in our culture. ... Because the jurors said they had no experience with victims of child abuse, we assume they would not have been exposed to the contention that it is common for children to report familial sexual abuse and then retract the story. Such evidence might well help a jury make a more informed decision in evaluating the credibility of a testifying child.

If a qualified expert offers to give testimony on whether the reaction of one child is similar to the reaction of most victims of familial child abuse, and if believed this would assist the jury in deciding whether a rape occurred, it may be admitted.

\* \* \* \* \* \*

We hold that if a witness is accepted as an expert by the trial court, it is not

---

**9.** The interrelationship of these rules with Mil. R.Evid. 401 and 402 has been recognized. S. Saltzburg, L. Schinasi, and D. Schleuter, *Military Rules of Evidence Manual* 325 (1981). The expanded concept of "relevant evidence" therein set forth is in keeping with the overall philosophy of the Military (and Federal) Rules of Evidence.

**10.** We have used the term "incest," but it should be noted that the accused was not the natural father of the victim, a frequent common factor in these cases.

error to allow testimony describing the reaction of the typical child victim of familial sexual abuse and whether a testifying victim impeached by her prior inconsistent statement reacted in the typical manner when she made that inconsistent statement.

657 P.2d at 1220–21.

We think that there is a sufficient body of "specialized knowledge" as to the typical behavior of sexually abused children and their families to permit certain conclusions to be drawn by experts as to such behavioral patterns. *See* Note, *Unequal and Inadequate Protection Under the Law: State Child Abuse Statutes,* 50 Geo.Wash.L.Rev. 243 (1982); "Sexual Abuse of Children: Selected Readings" (National Center on Child Abuse and Neglect 1980); Finkelhor, *Sexually Victimized Children* (1979); Walters, *Physical and Sexual Abuse of Children* (1975). The two experts who testified here had considerable personal experience with similar cases. Their qualifications in the area were unchallenged. Certainly there would be no restriction to allowing the experts to testify as to their training and personal experience, which provides the basis for their opinions as to this particular case. Mil.R. Evid. 703 and 705. It thus appears that both requirements of Mil.R.Evid. 702 were satisfied here.

There remains the latent matter of testimony going to the "ultimate issue." No witness testified as to his/her opinion of the guilt of the accused, but certain answers relative to the "believability" of the victim by implication, at least, would pertain to the innocence of the accused; that is, if the victim is believed, then the accused would logically be found guilty. Mil. R.Evid. 704 permits "an opinion or inference" to be admitted, even if "it embraces an ultimate issue to be decided by the trier of fact." In *State v. Middleton, supra,* the defendant contended that the opinions of the social workers "invaded the province of the jury." *Id.* at 1218. The Court held:

It is the settled law in Oregon that testimony on the ultimate issue is not inad-

missible solely on that basis. . . . . [I]t is impossible to usurp the jury's function. Even if there is uncontradicted expert testimony, the jury is not bound by it, for the jury alone must make the ultimate decision. [Citation omitted.]

It is true that if the jurors believed the experts' testimony, they would be more likely to believe the victim's account. Neither of the experts directly expressed an opinion on the truth of the victim's testimony. Much expert testimony will tend to show that another witness either is or is not telling the truth. [Citation omitted.] This, by itself, will not render evidence inadmissible.

657 P.2d at 1219.

The Analysis of Rule 704, Manual, *supra,* states that "[t]he Rule does not permit the witness to testify as to his or her opinion as to the guilt or innocence of the accused." Obviously, "no witness helps the court members by offering a judgment on ultimate guilt and innocence. This adds nothing to the information about the case that the court members have to assist them in their decision." *Military Rules of Evidence Manual, supra* at 329. The military judge correctly rejected any statements which would infringe upon his authority to make the ultimate decision as to guilt or innocence of the accused.

The military judge has the discretion to decide whether there is a "specialized knowledge" that will assist him in understanding the evidence or determining the facts in issue. Our review of the record discloses no abuse of that discretion by the judge when he permitted these witnesses to testify. This is, of course, particularly true where there was no objection by defense counsel, Mil.R.Evid. 103(a)(1), and where the military judge is the trier of fact. *United States v. Montgomery, supra.*

The decision of the United States Air Force Court of Military Review is affirmed.

Judge FLETCHER concurs.

EVERETT, Chief Judge (concurring in the result):

## I

My examination of the record reveals no inconsistency in the military judge's findings. Instead, they seem to reflect his painstaking analysis of the evidence.

If inconsistency had appeared in the findings, I would share the majority's reluctance to follow *United States v. Maybury*, 274 F.2d 899 (2d Cir. 1960). However, if feasible, I would have considered remanding the case to the original trial judge to make supplemental findings that might clarify the supposed inconsistency.* Likewise, I believe that a convening authority or other reviewing authority should consider requesting a trial judge to make supplemental findings to explain any seeming inconsistency in his findings.

## II

In rebuttal, the Government called expert witnesses to help rehabilitate the credibility of the somewhat discredited victim. Because at trial the defense did not object to their testimony, appellant may not complain thereof on appeal. However, if an objection had been made, I would have serious doubts about the admissibility of some of the opinions expressed.

As I explained in my dissent in *United States v. Moore*, 15 M.J. 354 (C.M.A. 1983), I am concerned about the hazard that an expert witness' testimony may be allowed to outrun the scope of his expertise. Experts may testify that a victim's behavior—however unusual it might at first appear—

actually is typical of those persons who have undergone a trauma like that which the victim claims to have endured. On the other hand, I have grave reservations about the admissibility of an expert's opinion that the victim's behavior after the alleged trauma demonstrates that his account of the trauma must be true. Certainly, I would not permit an expert to testify—as did one government witness in this case—that he believes the witness' account of the trauma allegedly experienced.

In evaluating someone's credibility, "scientific, technical, or other specialized knowledge" is of limited assistance to the trier of fact. *Cf.* Mil.R.Evid. 702. Indeed, hearing a purported expert give his opinion about the credibility of a witness may hinder the factfinder by distracting him from using his own experience and common sense, which provide the best means for him to determine the truthfulness of testimony he has heard. Moreover, an anomaly will exist if we continue to exclude the opinions of polygraph operators—who are specially trained and equipped to detect deception—but receive in evidence the opinions of various other "experts" about whether a victim or other witness has been telling the truth.

## III

From a general reading of the record, I have the disquieting belief that appellant's conviction may have been a miscarriage of justice. However, since I have discerned no prejudicial legal error, I reluctantly must join in affirming the decision of the Court of Military Review.

---

* Under paragraph 74*i* of the Manual for Courts-Martial, United States, 1969 (Revised edition), "[a] request for special findings must be made" before general findings are announced. Even so, a defense counsel who perceived inconsistency in the general findings may properly ask that the judge—in his discretion—make special findings to clear up the seeming inconsistency.