## UNITED STATES

### v.

**Dwayne A. COX, 088 52 5575, Hospitalman (E-3), U.S. Navy.**

**NMCM 86 0968.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 28 Oct. 1985.

Decided 19 Dec. 1986.

LCDR Robert J. Smith, JAGC, USN, Appellate Defense Counsel.

LT Richard F. McManus, JAGC, USNR, Appellate Defense Counsel.

Jon Landau, Esquire, Civilian Defense Counsel.

LT Thomas J. Seaton, JAGC, USNR, Appellate Government Counsel.

Before GORMLEY, Chief Judge, and MITCHELL and RILEY, JJ.

**PER CURIAM:**

At a general court-martial composed of officer members, appellant was found guilty, contrary to his pleas, of 1 specification of sodomy, 5 specifications of indecent assault, 1 specification of indecent exposure, and 1 specification of communication of indecent language, in violation of Articles 125 and 134 of the Uniform Code of Military Justice, 10 U.S.C. sections 925 and 934. He was sentenced to confinement for 7 years, total forfeitures, reduction to pay grade E–1, and to be dishonorably discharged from the Naval Service. The convening authority approved the sentence as adjudged.

The charges in the instant case arose from sexual assaults perpetrated by the appellant upon three patients and a co-worker during the time he was performing duties as a hospital corpsman at Naval Hospital, Naval Air Station, Corpus Christi, Texas, from April thru June 1985. Before this Court appellant asserts (1) that the military judge erred in failing to sustain the defense objection to the Government's use of its peremptory challenge to strike the court-martial panel's lone black member; (2) that the military judge abused his discretion in allowing a rape trauma expert to testify on the merits of the case; (3) that the military judge erred in permitting that same rape trauma expert to state that she believed the victim was telling the truth; and (4) that the military judge's failure to *sua sponte* instruct on the lesser included offense of attempted sodomy constituted prejudicial error. Finding no prejudicial error, we affirm the findings and sentence.

## GOVERNMENT'S PEREMPTORY CHALLENGE OF THE COURT'S LONE BLACK MEMBER

The appellant is a black male who was charged with committing sexual assaults upon four white women. He chose to be tried by a forum consisting of officer members. The members detailed to the general court-martial to which the instant charges were referred consisted of two Navy Captains, a Marine Lieutenant Colonel (LtCol),

a Navy Commander (CDR), two Navy Lieutenant Commanders (LCDR), and two Navy Lieutenants. After the parties had conducted voir dire, the military judge *sua sponte* challenged LtCol A, defense counsel peremptorily challenged CDR B, and trial counsel peremptorily challenged LCDR B, the panel's lone black member. The military judge excused the three challenged members and recessed the court until the following morning. At the inception of that next morning's Article 39(a), 10 U.S.C. section 839(a), session, the defense counsel moved "that the exercise of a peremptory challenge to exclude the only black that would have been eligible for this court was an unconstitutional exercise" of the Government's peremptory challenge and asked that the military judge recall the previously excused LCDR B to sit on the court-martial panel. The military judge denied the defense motion and the court-martial proceeded without the participation of LCDR B or any substitute black panel members.

■ Before this Court, appellant renews his argument concerning the allegedly discriminatory peremptory challenge and asserts that the Supreme Court case of *Batson v. Kentucky*, 476 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), decided on 30 April 1986, some 6 months subsequent to the trial in the instant case, should be given retroactive effect and requires that appellant's conviction be set aside and a new trial granted. We disagree.

In *Batson*, the Supreme Court reexamined the evidentiary burden placed on an accused claiming a deprivation of equal protection due to the Government's use of peremptory challenges to exclude members of his race from the petit jury. Up until *Batson*, a number of lower courts had determined, based upon their interpretation of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), "that proof of repeated striking of blacks *over a number of cases* was necessary to establish a violation of the Equal Protection Clause." *Batson*, 106 S.Ct. at 1720 (em-

phasis added). Because of the "crippling burden of proof" this evidentiary formulation placed on criminal defendants alleging discriminatory peremptory challenge practice, the *Batson* Court made clear that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 1722–1723. In order to establish such a case, the Court determined that the accused

> first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)). After advising that, "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all the relevant circumstances," [1] the Court concluded that "[i]f the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed." *Id.* at 1725.

■ In the instant case, appellant urges that (1) the *Batson* rule applies to courts-martial; (2) the *Batson* rule should be applied retroactively to cases on direct appeal; and (3) the appellant is entitled to a new trial based upon *Batson*. We need not address the issue of court-martial applica-

---

1. *Batson*, 106 S.Ct. at 1723.

bility or retroactivity.[2] Even assuming *arguendo* the applicability of the *Batson* rule to the case at bar, we find that the record does not reflect a discriminatory purpose on the part of trial counsel in challenging the lone black member, and, even if it can be said that the defense did establish such a *prima facie* case, government counsel has since come forward with a neutral explanation for his action.

Appellant maintains that the *Batson* three-pronged test[3] was satisfied since (1) the appellant is a member of the black race and trial counsel used his peremptory challenge to remove from the court-martial panel the only member of the appellant's race; (2) he is entitled to rely on the fact that the nature of peremptory challenge practice permits those to discriminate who are of a mind to discriminate; and (3) the other factual circumstances raise the inference that trial counsel used his peremptory challenge to exclude blacks from the court-martial panel—specifically, that trial counsel's action peremptorily challenging LCDR B rather than one of the two lieutenants on the panel was inconsistent with his stated policy, elicited through his own testimony during an earlier defense motion concerned with the absence of junior officers on the panel, that he much preferred to have experienced senior officers rather than junior officers on a court-martial panel. We disagree with appellant's assessment of the third factor. The plethora of factors which exist in addition to the factor of seniority, and which are all considered in the assessment of the desirability or non-desirability of a panel member on a court-martial, suggest that a prosecutor's ostensibly internally inconsistent peremptory challenge with respect to one of those factors is insufficient to raise an inference that his challenge is evidence of purposeful discrimination. Even assuming that appellant did establish a prima facie case of purposeful

discrimination, however, we are satisfied with trial counsel's neutral explanation for his challenge of LCDR B—that his deliberate and hesitant manner of answering the questions posed to him indicated to trial counsel that LCDR B was an overly cautious individual who would find it hard to convict. Affidavit of trial counsel dated 26 August 1986. *See Batson*, 106 S.Ct. at 1725. We conclude therefore that this assignment of error is without merit.

## EXPERT TESTIMONY ON RAPE TRAUMA SYNDROME

Appellant's second and third assignments of error are based on the admission of the expert testimony of Dr. Ellen Kay Nelson, a psychologist, who was called by the Government in rebuttal to testify as an expert on "Rape Trauma Syndrome." With respect to the admission of this expert testimony, appellant alleges that (a) the military judge abused his discretion in permitting a rape trauma expert to testify on the merits of the case and (b) the military judge erred in permitting the rape trauma expert to state that she believed the victim was telling the truth with respect to the occurrence of the assault.

This case involves a hospital corpsman who was convicted of seven sexual assaults on four women—three of whom were in-patients at Naval Hospital, Corpus Christi, at the time of the assaults. The primary incident involved an assault on Mrs. Linda B, an in-patient at the hospital who was suffering from the effects of a kidney infection and from post-polio syndrome. She testified that the appellant had sexually assaulted her while attending her in the hospital room she shared with two other patients. According to Mrs. B's testimony, sometime at the end of April 1985, the appellant came into her room and passed through the curtains that were around her

---

**2.** The Supreme Court has recently granted certiorari to resolve the question of *Batson's* retroactivity. *See Griffith v. Kentucky*, —— U.S. ——, 106 S.Ct. 2274, 90 L.Ed.2d 717 (*cert. granted* 1986) and *Brown v. United States*, —— U.S. ——, 106 S.Ct. 2275, 90 L.Ed.2d 718 (*cert. grant-*

ed 1986); *compare Allen v. Hardy*, —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam) (*Batson* not retroactive on collateral attack).

**3.** *Batson*, 106 S.Ct. at 1723.

bed—ostensibly, in the performance of his normal duties. After beginning to attend to her he proceeded for the next 30 minutes to sexually abuse her—using indecent language, exposing himself, touching her breasts, placing his penis into her mouth and ejaculating on her face. According to Mrs. B's testimony, someone came into the room looking for the appellant, but the attack did not cease. Mrs. B's two roommates testified to being awake and in the room, albeit on the other side of the curtains, during the entire incident. Neither noticed anything unusual apart from the length of time appellant was in the room. In his defense, the appellant, the holder of a bachelor's degree in psychology, testified that he remembers having spent about 30 minutes with Mrs. B on one occasion listening to her problems and counseling her. Mrs. B did not report the incident until several days after its alleged occurrence on 6 May 1985. Thereafter she gave several different versions to various people concerning the extent to which the appellant had sexually abused her.

In a pretrial motion for appropriate relief, appellant requested that the military judge prohibit the Government from introducing on the merits any evidence pertaining to rape trauma syndrome or relating to any psychological evaluation of Mrs. B subsequent to her alleged assault. Upon considering the briefs and arguments of counsel and after listening to the testimony of the prospective government expert, Dr. Nelson, the military judge ruled that he would allow Dr. Nelson to testify on the Government's case in rebuttal, but only on a very limited basis. Specifically, the military judge ruled that Dr. Nelson would be allowed to testify only for the purpose of explaining (1) that victims of sexual assault commonly make inconsistent statements regarding the offense, (2) that some victims of sexual assault do not fight back at the time of the assault, and (3) the lack of fresh complaint. He further explained that he would not allow the testimony to be used for the purpose of proving that the assault in fact occurred or to serve as a

professional evaluation of the truthfulness of Mrs. B.

During trial on the merits, the defense counsel elicited testimony concerning Mrs. B's rendering of several different versions of the assault to various people, her failure to cry out during the assault despite the fact that it occurred within feet of at least two witnesses who could presumably have caused the assault to cease, her delay of several days in reporting the assault to anyone, and her "unnatural" calmness and detachment in the way that she recounted details of the assault to several people. Upon trial counsel's request, the military judge ruled that, since the defense had opened the door with "specific questions concerning the demeanor of Mrs. B as an individual with respect to her reactions as to the alleged sodomy and other indecent assaults," he would broaden the scope of the prosecution expert's testimony in rebuttal by allowing her to testify with respect to the individual characteristics of Mrs. B which might tend to rebut the above-mentioned testimony elicited by the defense. During Dr. Nelson's direct examination in the Government's case on rebuttal, the trial counsel established her as an expert witness in the field of the psychology of rape and rape trauma syndrome, and elicited testimony concerning rape trauma syndrome generally, concerning Dr. Nelson's work with Mrs. B, and why it was not unusual that Mrs. B had given a number of different versions of the alleged sexual assault. During cross-examination, the following colloquy between defense counsel and Dr. Nelson ensued:

> Q: Let me ask you a hypothetical question. Would it be possible for a woman, say especially a woman who has suffered characteristic depression in the past, caused by, say, a disability in our case, who has already had feelings of helplessness, loss of self-esteem, caused by this disability, would it be impossible for such a woman with some knowledge of rape trauma syndrome to convincingly exhibit symptoms of rape trauma?
>
> A: I think anything is possible.

Q: The field of rape, child abuse, rape, rape trauma has been a pretty largely aired issue lately, hasn't it? I mean, TV shows, TV movies, talk shows, magazine articles, newspapers, it has really been inundated by that haven't they?

A: That is true, it has.

. . . . .

Q: It is possible that Mrs. B[_____] could have seen a number of TV shows or articles, and read up on rape trauma syndrome, is it not?

A: I'm sure she could have.

Q: And since you hadn't seen her right away after the rape, there was quite an elapsed time between April 28th and when you finally saw her in August?

A: There was an elapsed time, yes.

Q: She could have, in fact, become rather knowledgeable regarding the symptoms of rape trauma syndrome, correct?

A: Yes.

. . . . .

On trial counsel's redirect examination, the following ensued:

Q: You were just asked a question a second ago. First you were asked a hypothetical question about could a woman self-educate herself to the degree where she would be able to fabricate the symptoms of rape trauma syndrome. Then that hypothetical was filled in with Mrs. B[_____] specifically. I have two questions. The first is: In your opinion, after all your experience and knowledge in the field, has Mrs. Linda B[_____] fabricated everything to you, and if not, how can you say that?

A: I don't believe she has fabricated anything to me. In particular, looking at her background history, and the kind of person she has been in the past, there has been nothing I have been able to come upon that would indicate that she would not only have the capability, but she is not the type of personality or character that would do that kind of thing.

Defense counsel's next question on recross examination was:

Q: Doctor Nelson, your characterization of Mrs. B[_____]'s believability that could mean either one of two things. Couldn't it either—I guess one of three things—either, (a) she, in fact did suffer this traumatic experience, or, (b) she knows of the symptoms and she is a very good actor, or, (c) that she, in fact, believes everything that she said even though it didn't happen.

A: I believe that it happened, and I also believe that she is telling the truth. Everything is congruent. The kind of fear she has had. I don't think she could construct the kind of descriptions she has given me. I haven't gone into many details here about nightmares or the kind of anxiety she has suffered on a day to day basis, but it has been a daily thing and it has been chronic. It would be difficult to construct the elaborate descriptions or the narrative.

Upon redirect examination, trial counsel asked a series of questions, requesting Dr. Nelson to elaborate on things which lead her to conclude that Mrs. B had in fact been assaulted, which culminated in the following exchange:

Q: And your observations were more of a professional observation than mine or anyone else's in this courtroom. Were those crocodile tears that she was shedding?

ADC: Your honor, I object at this time. I thing [sic] we are starting to invade the province of the jury here.

MJ: Overruled.

A: I thought she was extremely composed, considering what she was dealing with. I was glad she was able to control her emotions as well as she was, because recently she has begun to deal more with her emotions. It was a concern that she would not be able to handle the verbal information, and the emotion in an organized way. I thought she was sincere and did real well.

Rape trauma syndrome has been defined as the pattern of behavioral, somatic, and psychological reactions common to rape victims. *United States v. Hammond,* 17 M.J.

218, 220 n. 3 (C.M.A.1984). The term comes from a study of rape victims conducted by Ann Wolbert Burgess and Lynda Lytel Holstrom from July 1972 to July 1973.[4] Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minnesota Law Review 395, 424 (1985) [Massaro, *The Rape Trauma Syndrome*]. A number of state courts have passed on the issue of the admissibility of expert testimony concerning an alleged rape victim's affliction with rape trauma syndrome. *See United States v. Carter*, 22 M.J. 771, 773 (ACMR 1986) and cases cited therein. These courts have come to differing conclusions with respect to the relevance and admissibility of evidence of rape trauma syndrome (RTS). In *People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Reptr. 450, 681 P.2d 291 (1984), for example, the California Supreme Court determined that while RTS evidence may be admissible to rebut an inference that some conduct of the victim after the incident is inconsistent with her claim of having been raped, it is not generally relied upon by the scientific community and hence not admissible for the purpose of proving that a rape in fact occurred. Other state courts have held that the scientific evaluation of RTS had not reached a level of reliability which surpassed the common-sense evaluation present in jury deliberations, *State v. Saldana*, 324 N.W.2d 227 (Minn.1982), or that it had not yet reached that level of acceptability or rational soundness to overcome the inherent danger of prejudice created by the expert's status as an expert, *State v. Taylor*, 663 S.W.2d 235 (Mo.1984) (*en banc*). In *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982), however, the Supreme Court of Kansas held that qualified expert testimony regarding the existence of RTS is relevant and admissible in a case where the defense is consent, since the presence of RTS is detectable and reliable as evidence that a forcible assault did take place.

In the military, the Court of Military Appeals (COMA) has held expert testimony relating to the general effects of rape trauma to be admissible as evidence in aggravation after an accused's pleas of guilty to the crime of rape. *United States v. Hammond*, 17 M.J. 218 (C.M.A.1984). COMA, however, has not yet ruled whether evidence of rape trauma syndrome is admissible on the merits to prove guilt of sexual assault. The Courts of Military Review have considered the issue in only a few published decisions. In *United States v. Tomlinson*, 20 M.J. 897 (ACMR 1985), a panel of the Army Court of Military Review found the admission of RTS testimony to constitute prejudicial error necessitating the setting aside of findings of guilty to rape where the Government introduced the testimony for more than the limited purpose of showing that the inconsistencies in the alleged victim's statements were the product of emotional trauma. The Court found the expert testimony to be simply an improper bolstering of the victim's credibility where the Government introduced it for the purpose of proving that, because she suffered from rape trauma syndrome, the prosecutrix had in fact been raped. The Court noted, however, that such evidence is relevant and "may not be unduly prejudicial provided the testimony is couched in general terms and is not offered as a professional evaluation of the truthfulness of a witness." *Id.* at 902. In *United States v. Carter*, 22 M.J. 771, another panel of the Army Court found that evidence of rape trauma syndrome "serves as a helpful tool by providing the fact-finders with knowledge regarding a victim's psychological reactions to an alleged sexual assault," and held it to be "admissible on the merits on the issue of consent when presented by a properly qualified expert and accompanied by a proper limiting instruction by the military judge." *Carter*, 22 M.J. at 775 and 776–777.

■ Our study of the above-cited authorities and of the testimony of the rape trauma syndrome expert in the instant case

4. Burgess and Holstrom, *Rape Trauma Syn-* *drome*, 131 Am.J.Psychiatry 981 (1974).

leads us to conclude, like the Court in *Carter, supra*, that "there is sufficient data available to support the existence of rape trauma syndrome," and that "rape trauma syndrome is officially recognized by the psychiatric community as valid and reliable, and is generally accepted as a valid scientific principle." *Carter*, 22 M.J. at 775. We find that evidence of rape trauma syndrome is relevant and of particular assistance to the trier of fact under Military Rule of Evidence (Mil.R.Evid.) 702 where it helps to dispel some of the popular myths concerning rape—especially in a case, such as the instant case, where the very crux of the defense depends upon the pervasiveness of the common man's belief in those myths. *See generally* Massaro, *The Rape Trauma Syndrome*, 69 Minnesota Law Review at 402–410. Thus, we find that where the defense raises the issue of the victim failing to fight off the attacker, the existence of several inconsistent statements concerning the assault, the absence of fresh complaint, and/or the victim's calm and "unnatural" recounting of the circumstances of the incident, evidence of rape trauma syndrome is admissible on the merits to rebut the inference that such conduct of the victim is inconsistent with her claim of being raped—when presented by a qualified expert and accompanied by an appropriate limiting instruction. Thus, the military judge did not abuse his discretion in allowing the rape trauma evidence witness to testify on the merits of the case. Appellant's assignment of error asserting otherwise is without merit.

We turn now to the issue of whether the military judge erred in permitting the rape trauma syndrome expert to state that she believed the victim was telling the truth.

As recounted above, in his ruling on the appellant's motion requesting the exclusion of any testimony concerning rape trauma syndrome, the military judge made clear the fine parameters within which the rebuttal testimony would be restricted. He expanded the prosecutorial discretion in that area only slightly upon the conclusion of the defense's presentation of its case, based upon its inquiries into areas concern-

ing specific instances of Mrs. B's behavior which inferred that her actions were inconsistent with those of a recent rape victim. The excerpts from Dr. Nelson's testimony presented *supra*, however, reveal that the military judge's boundaries were seriously violated. We must determine (1) whether it was error for the military judge to allow the expert to render her opinion concerning the truthfulness of the victim's story, and (2) if so, was it prejudicial error necessitating relief.

We find, first of all, that the military judge appropriately instructed the parties that he would not allow the expert to testify that the assault had in fact occurred. *See United States v. Cameron*, 21 M.J. 59 (C.M.A.1985); *United States v. Tomlinson, supra; United States v. Carter, supra; People v. Bledsoe*, 203 Cal.Rptr. 450, 681 P.2d 291; *State v. Taylor*, 663 S.W.2d 235 (Mo.1984); *State v. Saldana*, 324 N.W.2d 227 (Minn.1982). Our careful reading of the testimony of the government witness on direct examination reveals that government counsel adhered scrupulously to the military judge's instructions respecting the parameters of permissible inquiry. During the subsequent cross, redirect, and recross examinations, however, the pertinent portions of which have been set forth above, the testimony elicited from the witness went well beyond any permissible avenues of examination and invaded the province of the jury with respect to the determination of the credibility of witnesses and the ultimate issue of the guilt or innocence of the appellant.

" 'It is hornbook law that the credibility of a witness and the weight to be given his testimony rests exclusively with the jury.' " *United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986) (quoting *United States v. Rosenberg*, 108 F.Supp. 798, 806 (S.D.N.Y. 1952), *aff'd*, 200 F.2d 666 (2d Cir.1952)). " [O]pinion testimony on credibility is limited to character; all other opinions on credibility are for the jurors themselves to form.' " *Id.* (quoting *United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.), *cert. denied*, 444 U.S. 885 and 969, 100 S.Ct. 179

and 460, 62 L.Ed.2d 116 and 383 (1979)). Mil.R.Evid. 702 does not permit the testimony of an expert witness on the issue of credibility.

> Competency is for the judge, not the jury. Credibility, however, is for the jury—the jury is the lie detector in the courtroom ... It is now suggested that psychiatrists and psychologists have more expertise in weighing the veracity of a witness than either judges or juries, and that their opinions can be of value to both judges and juries in determining credibility. Perhaps. The effect of receiving such testimony, however, may be two-fold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral but still an important matter.

*Azure*, 801 F.2d at 340 (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974)). COMA's position on whether or not an expert may give his opinion respecting the truthfulness of a witness's testimony or statement was presaged by Chief Judge Everett's strongly-worded concurrence in the result of *United States v. Snipes*, 18 M.J. 172 (C.M.A.1984):

> Experts may testify that a victim's behavior—however unusual it might at first appear—actually is typical of those persons who have undergone a trauma like that which the victim claims to have endured. On the other hand, I have grave reservations about the admissibility of an expert's opinion that the victim's behavior after the alleged trauma demonstrates that his account of the trauma must be true. Certainly, I would not permit an expert to testify ... that he believes the witness' account of the trauma allegedly experienced.
>
> In evaluating someone's credibility, "scientific, technical, or other specialized knowledge" is of limited assistance to the trier of fact. *Cf.* Mil.R.Evid. 702. Indeed, hearing a purported expert give his opinion about the credibility of a witness may hinder the factfinder by dis-

tracting him from using his own experience and common sense, which provide the best means for him to determine the truthfulness of testimony he has heard. Moreover, an anomaly will exist if we continue to exclude the opinions of polygraph operators—who are specially trained and equipped to detect deception—but receive in evidence the opinions of various other "experts" about whether a victim or other witness has been telling the truth.

*Snipes*, 18 M.J. at 180 (Everett, C.J., concurring in the result). COMA expressly held thusly in *United States v. Cameron*, 21 M.J. 59 (C.M.A.1985), setting aside the findings of guilty and the sentence because of an expert's testimony that the victim had told the truth about the incident in question. Furthermore, it is clear from a straightforward reading of Mil.R.Evid. 608(a) that opinion or reputation evidence relating to the credibility of a witness "may refer only to *character* for truthfulness or untruthfulness." Mil.R.Evid. 608(a)(1) (emphasis added).

■ It is obvious that Dr. Nelson's testimony in the instant case went beyond the limitation in Rule 608(a)(1) of addressing only character for truthfulness and addressed instead the specific believability and truthfulness of Mrs. B's story. *See Azure*, 801 F.2d at 341. " 'Such testimony is capable at times of so bolstering a witness' testimony as artificially to increase its probative strength with the jury, and ... its admission therefore may in some situations on this basis constitute reversible error.' " *Id.* (quoting *Homan v. United States*, 279 F.2d 767, 772 (8th Cir.), *cert. denied*, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960)). The military judge abused his discretion in allowing Dr. Nelson to give her opinion as to the believability of Mrs. B's story.

While the admission of expert testimony relating to the believability of a witness's testimony or statement can result in prejudicial error requiring corrective action, reversal is not required if the trial court's

error can be determined to be harmless. *United States v. Cameron,* 21 M.J. 59 (C.M.A.1985); *Azure,* 801 F.2d at 341; *United States v. Arruza,* 21 M.J. 621, 623–624 (ACMR 1985). In the instant case, it is clear from the lengthy excerpt of the relevant testimony set forth above that it was the defense that unlocked and opened the door to the expert's opinion on the believability of Mrs. B's story, a door which had been locked shut by the military judge in his ruling concerning the scope of the testimony and which had not been knocked upon by trial counsel during his direct examination. Defense counsel initiated the receipt of testimony concerning the credibility of the victim's story, and himself adduced, during recross examination, the most damaging statement elicited from the expert witness with respect thereto, to wit: "I believe that it happened, and I also believe that she is telling the truth. Everything is congruent. The kind of fear she has had. I don't think she could construct the kind of descriptions she has given me." Thus, any error "was defense induced and therefore constitutes an inappropriate predicate for appellate relief." *Arruza,* 21 M.J. at 623; *see also Carter,* 22 M.J. at 772; *United States v. Moore,* 15 M.J. 354, 366 (C.M.A.1983) (Cook, J. with Fletcher, J., concurring in the result); *United States v. Snipes,* 18 M.J. 172, 177 (C.M.A.1984). Furthermore, there was no opposition by the appellant to the impermissible testimony until its largest and most damaging portion had been admitted without objection. Additionally, despite allowing the testimony before the members, the military judge went forward with his originally intended instruction limiting the use to which they could put the expert's testimony, *see Moore, supra* at 366, an instruction which we set forth below because it addresses precisely the proper scope of consideration for evidence of rape trauma syndrome in the instant case:

> Gentlemen, you've just heard the testimony of Dr. Kaye Nelson, an expert, concerning counseling in connection with rape trauma syndrome. Experts are known as expert witnesses because they have knowledge, skill, training, or education which may assist you in understanding the evidence or in determining a fact in issue. You are not required to accept the testimony of an expert witness or to give it more weight than the testimony of an ordinary witness. I also want to give you an instruction or a.... yes, an instruction concerning the testimony you've just heard from Dr. Nelson. Now, the testimony you've just heard from Dr. Kaye Nelson must be considered by you for limited purposes. You are not to infer that because Linda B[_____] displays some symptoms of rape trauma syndrome that a sexual assault against her must have occurred. Dr. Nelson's testimony, including the basis and background for her testimony brought out in court, was offered by the government in rebuttal for the following limited purposes.
>
> One, to explain the absence of fresh complaint in Linda B[_____]'s reporting an offense.
>
> Two, to explain apparent inconsistencies in her versions of the alleged assault as she related it to various persons.
>
> Three, to explain the apparent absence of overt resistance or cries of alarm by Linda B[_____] during the alleged attack.
>
> Fourth, to explain the testimony of Mrs. P[_____], Linda B[_____]'s neighbor, that Linda B[_____] apparently showed no emotion as she related to Mrs. P[_____], "I was raped at the Naval Hospital.", [sic] or words to that effect.
>
> Fifth, to explain the absence of emotion by Mrs. B[_____] as she related to Mrs. W[_____] how the accused masturbated in front of her at the Naval Hospital. And, to explain and rebut the statement that Mrs. W[_____] had known other victims of sex crimes in her capacity as a Red Cross volunteer. And, that Mrs. B[_____]'s reaction was not natural.
>
> Once again, you must not conclude that simply because Mrs. B[_____] apparently possesses symptoms of rape trauma syndrome that a sexual assault has occurred. The rebuttal testimony of Dr.

**818**

Nelson only serves to explain the testimony of Mrs. B[_____], Mrs. P[_____], and Mrs. W[_____] concerning the specific issues I've outlined for you. It's your job as members in this case to make the ultimate determination as to where the truth lies in this case.

Based on the above, we conclude that the admission of the impermissible expert testimony rendering an opinion as to the believability of the prosecutrix does not merit relief. Appellant's assignment is without merit.

### FAILURE TO INSTRUCT ON THE LESSER INCLUDED OFFENSE OF ATTEMPTED SODOMY

 Finally, appellant asserts that the military judge erred in not giving an instruction on the lesser included offense of attempted sodomy since the evidence was unclear whether the appellant had forced his penis past the teeth of Mrs. B or only past the lips and against the teeth of Mrs. B. We find no merit in this assignment of error. Penetration, however slight, by the male genital into an orifice of the human body, except the vaginal opening of the female, is sufficient to establish sodomy. Manual for Courts-Martial, United States, 1984, Part IV, paragraph 51a(a). Penetration past the lips and not beyond the teeth was sufficient to constitute the offense of sodomy in violation of Article 125, Uniform Code of Military Justice, 10 U.S.C. section 925.

Accordingly, the findings of guilty and the sentence, as approved on review below, are affirmed.

MITCHELL, J., absent.