# STANDEFER *v.* UNITED STATES

No. 79–383.  Argued April 14, 1980—Decided June 9, 1980

BURGER, C. J., delivered the opinion for a unanimous Court.

*Harold Gondelman* argued the cause and filed briefs for petitioner.

*William Alsup* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann,* and *Deputy Solicitor General Frey.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to decide whether a defendant accused of aiding and abetting in the commission of a federal offense may be convicted after the named principal has been acquitted of that offense.

## I

In June 1977, petitioner Standefer was indicted on four counts of making gifts to a public official, in violation of 18 U. S. C. § 201 (f), and on five counts of aiding and abetting a revenue official in accepting compensation in addition to that authorized by law, in violation of 26 U. S. C. § 7214 (a)(2) and 18 U. S. C. § 2.[1] The indictment charged that

---

[1] Title 18 U. S. C. § 201 (f) provides, in relevant part, as follows:

"Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official . . . for or because of any official act performed or to be performed by such public official . . . [is guilty of an offense]."

Title 26 U. S. C. § 7214 (a) (2) punishes:

"Any officer or employee of the United States acting in connection with any revenue law of the United States . . . who knowingly demands other or greater sums than are authorized by law, or receives any fee, compen-

petitioner, as head of Gulf Oil Corp.'s tax department, had authorized payments for five vacation trips to Cyril Niederberger, who then was the Internal Revenue Service agent in charge of the audits of Gulf's federal income tax returns.[2] Specifically, the indictment alleged that Gulf, on petitioner's authorization, had paid for vacations for Niederberger in Pompano Beach (July 1971), Miami (January 1973), Absecon (August–September 1973), Pebble Beach (April 1974), and Las Vegas (June 1974).  The four counts under 18 U. S. C. § 201 (f) related to the Miami, Absecon, Pebble Beach, and Las Vegas vacations; the five counts under 26 U. S. C. § 7214 (a)(2) and 18 U. S. C. § 2 were one for each vacation.[3]

Prior to the filing of this indictment, Niederberger was separately charged in a 10-count indictment—two counts for each of the five vacations—with violating 18 U. S. C. § 201 (g)[4] and 26 U. S. C. § 7214 (a)(2).  In February 1977, Niederberger was tried on these charges.  He was convicted on four counts of violating § 201 (g) in connection with the vacations in Miami, Absecon, Pebble Beach, and Las Vegas and of

sation, or reward, except as by law prescribed, for the performance of any duty."

Title 18 U. S. C. § 2 provides in relevant part:

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

[2] The indictment also named Gulf Oil Corp. and Joseph Fitzgerald, a manager in Gulf's tax department, as defendants.  Gulf pleaded guilty and Fitzgerald *nolo contendere* to all nine counts.

[3] It appears that the statute of limitations had run on any violation of 18 U. S. C. § 201 (f) in connection with the Pompano Beach vacation.

[4] Title 18 U. S. C. § 201 (g) punishes:

"Whoever, being a public official . . . , otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him."

two counts of violating § 7214 (a)(2) for the Pebble Beach and Las Vegas trips. He was acquitted on the § 201 (g) count involving the Pompano Beach trip and on the three counts under § 7214 (a)(2) charging him with accepting payments from Gulf for trips to Pompano Beach, Miami, and Absecon.[5]

In July 1977, following Niederberger's trial and before the trial in his own case commenced, petitioner moved to dismiss the counts under § 7214 (a)(2) and 18 U. S. C. § 2 which charged him with aiding and abetting Niederberger in connection with the Pompano Beach, Miami, and Absecon vacations. Petitioner argued that because Niederberger, the only named principal, had been acquitted of accepting unlawful compensation as to those vacations, he could not be convicted of aiding and abetting in the commission of those offenses. The District Court denied the motion.

Petitioner's case then proceeded to trial on all nine counts. At trial, petitioner admitted authorizing payment for all five vacation trips, but testified that the trips were purely social and not designed to influence Niederberger in the performance of his official duties. The jury returned guilty verdicts on all nine counts.[6] Petitioner was sentenced to concurrent terms of six months' imprisonment followed by two years' probation; he was fined a total of $18,000—$2,000 on each count.

Petitioner appealed his convictions to the Court of Appeals for the Third Circuit claiming, *inter alia*, that he could not

---

[5] Niederberger was sentenced to six months' imprisonment followed by a five-year period of probation, and he was fined $5,000. His convictions were affirmed by the Court of Appeals. *United States* v. *Niederberger,* 580 F. 2d 63 (CA3 1978).

[6] The jury was instructed that in order to render a guilty verdict on the § 7214 (a) counts it must determine (1) that Niederberger knowingly "received a fee, compensation or reward except as prescribed by law . . . for the performance . . . of any duty" and (2) that petitioner "willfully aided and abetted [him]." App. 53a–54a, 57a.

be convicted of aiding and abetting a principal, Niederberger, when that principal had been acquitted of the charged offense. By a divided vote, the Court of Appeals, sitting en banc, rejected that contention. 610 F. 2d 1076 (1979). It concluded that "the outcome of Niederberger's prosecution has no effect on [petitioner's] conviction." *Id.*, at 1078.

Because the question presented is one of importance to the administration of criminal justice on which the Courts of Appeals are in conflict, we granted certiorari.[7] 444 U. S. 1011. We affirm.

## II

Petitioner makes two main arguments: first, that Congress in enacting 18 U. S. C. § 2 did not intend to authorize prosecution of an aider and abettor after the principal has been acquitted of the offense charged; second, that, even if § 2 permits such a prosecution, the Government should be barred from relitigating the issue of whether Niederberger accepted unlawful compensation in connection with the Pompano Beach, Miami, and Absecon vacations.[8] The first contention relies largely on the common law as it prevailed before the enactment of 18 U. S. C. § 2. The second rests on the contemporary doctrine of nonmutual collateral estoppel.

---

[7] The Courts of Appeals for the Fifth Circuit, the Ninth Circuit, and the District of Columbia Circuit have reached the same conclusion as the Third Circuit. See *United States* v. *Musgrave,* 483 F. 2d 327, 331–332 (CA5 1973); *United States* v. *Azadian,* 436 F. 2d 81 (CA9 1971); *Perkins* v. *United States,* 315 F. 2d 120, 122 (CA9 1963); *Gray* v. *United States,* 104 U. S. App. D. C. 153, 260 F. 2d 483 (1958). The Court of Appeals for the Fourth Circuit has taken the contrary view that "where the only potential principal has been acquitted, no crime has been established and the conviction of an aider and abettor cannot be sustained." *United States* v. *Shuford,* 454 F. 2d 772, 779 (1971). Accord, *United States* v. *Prince,* 430 F. 2d 1324 (CA4 1970). See also n. 11, *infra.*

[8] Petitioner also challenges the instructions to the jury on criminal intent. We agree with the Court of Appeals that the instructions were correct.

## A

At common law, the subject of principals and accessories was riddled with "intricate" distinctions. 2 J. Stephen, A History of the Criminal Law of England 231 (1883). In felony cases, parties to a crime were divided into four distinct categories: (1) principals in the first degree who actually perpetrated the offense; (2) principals in the second degree who were actually or constructively present at the scene of the crime and aided or abetted its commission; (3) accessories before the fact who aided or abetted the crime, but were not present at its commission; and (4) accessories after the fact who rendered assistance after the crime was complete. See W. LaFave & A. Scott, Criminal Law § 63 (1972); 4 W. Blackstone, Commentaries *33; Perkins, Parties to Crime, 89 U. Pa. L. Rev. 581 (1941). By contrast, misdemeanor cases "d[id] not admit of accessaries either before or after the fact," *United States* v. *Hartwell*, 26 F. Cas. 196, 199 (No. 15,318) (CC Mass. 1869); instead, all parties to a misdemeanor, whatever their roles, were principals. *United States* v. *Dotterweich*, 320 U. S. 277, 281 (1943); 1 C. Torcia, Wharton's Criminal Law § 33 (14th ed. 1978).

Because at early common law all parties to a felony received the death penalty, certain procedural rules developed tending to shield accessories from punishment. See LaFave & Scott, *supra,* at 499. Among them was one of special relevance to this case: the rule that an accessory could not be convicted without the prior conviction of the principal offender. See 1 M. Hale, Pleas of the Crown *623–*624. Under this rule, the principal's flight, death, or acquittal barred prosecution of the accessory. And if the principal were pardoned or his conviction reversed on appeal, the accessory's conviction could not stand. In every way, "an accessory follow[ed], like a shadow, his principal." 1 J. Bishop, Criminal Law § 666 (8th ed. 1892).

This procedural bar applied only to the prosecution of ac-

cessories in felony cases. In misdemeanor cases, where all participants were deemed principals, a prior acquittal of the actual perpetrator did not prevent the subsequent conviction of a person who rendered assistance. *Queen* v. *Humphreys and Turner,* [1965] 3 All E. R. 689; *Queen* v. *Burton,* 13 Cox C. C. 71, 75 (Crim. App. 1875). And in felony cases a principal in the second degree could be convicted notwithstanding the prior acquittal of the first-degree principal. *King* v. *Taylor and Shaw,* 168 Eng. Rep. 283 (1785); *Queen* v. *Wallis,* 1 Salk. 334, 91 Eng. Rep. 294 (K. B. 1703); *Brown* v. *State,* 28 Ga. 199 (1859); *State* v. *Whitt,* 113 N. C. 716, 18 S. E. 715 (1893). Not surprisingly, considerable effort was expended in defining the categories—in determining, for instance, when a person was "constructively present" so as to be a second-degree principal. 4 Blackstone, *supra,* at *34. In the process, justice all too frequently was defeated.

To overcome these judge-made rules, statutes were enacted in England and in the United States. In 1848 the Parliament enacted a statute providing that an accessory before the fact could be "indicted, tried, convicted, and punished in all respects *like the Principal."* 11 & 12 Vic. ch. 46, § 1 (emphasis added). As interpreted, the statute permitted an accessory to be convicted "although the principal be acquitted." *Queen* v. *Hughes,* Bell 242, 248, 169 Eng. Rep. 1245, 1248 (1860). Several state legislatures followed suit.[9] In 1899,

---

[9] By 1909, when § 2 was enacted, 13 States had enacted legislation providing that the acquittal of the actual perpetrator was not a bar to the conviction of one charged with giving him aid. See Cal. Stat., ch. 99, §§ 11, 12 (1850) (see *People* v. *Bearss,* 10 Cal. 68, 70 (1858)); Del. Rev. Stat., ch. 133, § 1 (1893); Iowa Rev. Code Ann. § 4314 (1885) (see *State* v. *Lee,* 91 Iowa 499, 501–502, 60 N. W. 119, 120 (1894)); Kan. Gen. Stat. § 5180 (1889) (see *State* v. *Bogue,* 52 Kan. 79, 86–87, 34 P. 410, 412 (1893)); Ky. Stat. § 1128 (1903) (see *Commonwealth* v. *Hicks,* 118 Ky. 637, 642, 82 S. W. 265, 266 (1904)); Miss. Code § 1026 (1906) (see *Fleming* v. *State,* 142 Miss. 872, 880–881, 108 So. 143, 144–145 (1926)); Mont. Penal Code Ann. § 1854 (1895); N. Y. Penal Code § 29 (1895)

Congress joined this growing reform movement with the enactment of a general penal code for Alaska which abrogated the common-law distinctions and provided that "all persons

(see *People* v. *Kief,* 126 N. Y. 661, 663–664, 27 N. E. 556, 557 (1891)); N. D. Rev. Code Crim. Proc. § 8060 (1895); Okla. Stat. § 5523 (1890); S. D. Stat. Ann. § 8520 (1899); Utah Comp. Laws § 4752 (1907); Wash. Code of Proc. § 1189 (1891) (see *State* v. *Gifford,* 19 Wash. 464, 467–468, 53 P. 709, 710 (1898)).

Since then, at least 21 other States have enacted legislation with that effect. See 1977 Ala. Act No. 607, § 425; Ariz. Rev. Stat. Ann. § 13–304–1 (1978); Ark. Stat. Ann. § 41–304 (1977); Colo. Rev. Stat. § 18–1–605 (1973) (see *Roberts* v. *People,* 103 Colo. 250, 87 P. 2d 251 (1938)); Conn. Gen. Stat. § 53a–9 (1979); Fla. Stat. § 777.011 (1979) (see *Butts* v. *State,* 286 So. 2d 28 (1973)); Ga. Code § 26–802 (1978); Ill. Rev. Stat., ch. 38, § 5–3 (1979); Ind. Code § 35–41–2–4 (Supp. 1978); La. Rev. Stat. Ann. § 14.24 (West 1974) (see *State* v. *McAllister,* 366 So. 2d 1340 (1978)); Me. Rev. Stat. Ann., Tit. 17–A, § 57 (1979); Mich. Comp. Laws § 767.39 (1970) (*People* v. *Smith,* 271 Mich. 553, 260 N. W. 911 (1935)); Mo. Rev. Stat. § 562.046 (1978); Neb. Rev. Stat. § 28–206 (Supp. 1978) (*State* v. *Rice,* 188 Neb. 728, 199 N. W. 2d 480 (1972)); N. H. Rev. Stat. Ann. § 626.8 (1974); N. J. Stat. Ann. § 2C: 2–6 (West Spec. Pamph. 1979); N. M. Stat. Ann. § 30–1–13 (1978); Pa. Cons. Stat., Tit. 18, § 306 (Supp. 1979); S. C. Code § 16–1–50 (1976) (*State* v. *Massey,* 229 S. E. 2d 332 (1976)); Tex. Penal Code Ann. § 7.03 (Vernon 1974); Wis. Stat. § 939.05 (1977).

Eleven other States have enacted statutes that modify the common-law rule; these statutes have not been authoritatively construed on whether an accessory can be prosecuted after his principal's acquittal. See Haw. Rev. Stat. § 702–225 (1976); Idaho Code § 19–1431 (1979); Mass. Gen. Laws Ann., ch. 274, § 3 (West 1970); Minn. Stat. § 609.05 (1978); Nev. Rev. Stat. § 195.040 (1979); Ohio Rev. Code Ann. § 2923.03 (1979); Ore. Rev. Stat. § 161.160 (1979); Vt. Stat. Ann., Tit. 13, § 3 (1974); Va. Code § 18.2–21 (1975); W. Va. Code § 61–11–7 (1977); Wyo. Stat. § 6–1–114 (1977).

Only four States—Maryland, North Carolina, Rhode Island, and Tennessee—clearly retain the common-law bar. See *State* v. *Ward,* 284 Md. 189, 396 A. 2d 1041 (1978); *State* v. *Jones,* 101 N. C. 719, 8 S. E. 147 (1888) (interpreting N. C. Gen. Stat. § 14–5 (1969)); R. I. Gen. Laws § 11–1–3 (1970); *Pierce* v. *State,* 130 Tenn. 24, 168 S. W. 851 (1914).

The Model Penal Code provides that an accomplice may be convicted "though the person claimed to have committed the offense . . . has been

concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime or aid and abet in its commission, though not present, are principals, and to be tried and punished as such." Act of Mar. 3, 1899, § 186, 30 Stat. 1282. In 1901, Congress enacted a similar provision for the District of Columbia.[10]

The enactment of 18 U. S. C. § 2 in 1909 was part and parcel of this same reform movement. The language of the statute, as enacted, unmistakably demonstrates the point:

> "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, *is a principal*." Act of Mar. 4, 1909, § 332, 35 Stat. 1152 (emphasis added).[11]

---

acquitted." § 2.06 (7) (Tent. Draft No. 3, 1955), and see comments 38–39 (Tent. Draft No. 1, 1953).

[10] The provision is still in effect; it provides that all persons "aiding or abetting the principal offender, shall be charged as principals and not as accessories, the *intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes. . . .*" Act -of Mar. 3, 1901, § 908, 31 Stat. 1337; D. C. Code § 22–105 (1973) (emphasis added).

[11] In 1951, the words "is a principal" were altered to read "is punishable as a principal." That change was designed to eliminate all doubt that in the case of offenses whose prohibition is directed at members of specified classes (*e. g.,* federal employees) a person who is not himself a member of that class may nonetheless be punished as a principal if he induces a person in that class to violate the prohibition. See S. Rep. No. 1020, 82d Cong., 1st Sess., 7–8 (1951). The change was fully consistent with congressional intent to treat accessories before the fact as principals and to abolish the common-law procedural bar. Indeed, by the time of the 1951 re-enactment, the Circuit Courts that had addressed the question had concluded that § 2 authorizes conviction of an aider and abettor notwithstanding the prior acquittal of the perpetrator of the offense. See *United States* v. *Klass,* 166 F. 2d 373, 380 (CA3 1948); *Von Patzoll* v. *United States,* 163 F. 2d 216, 219 (CA10 1947); *Kelly* v. *United States,* 258 F. 392, 402 (CA6 1919); *Rooney* v. *United States,* 203 F. 928,

The statute "abolishe[d] the distinction between principals and accessories and [made] them all principals." *Hammer* v. *United States,* 271 U. S. 620, 628 (1926). Read against its common-law background, the provision evinces a clear intent to permit the conviction of accessories to federal criminal offenses despite the prior acquittal of the actual perpetrator of the offense. It gives general effect to what had always been the rule for second-degree principals and for all misdemeanants.

The legislative history of § 2 confirms this understanding. The provision was recommended by the Commission to Revise and Codify the Criminal and Penal Laws of the United States as "[i]n accordance with the policy of recent legislation" by which "those whose relations to a crime would be that of accessories before the fact according to the common law are made principals." 1 Final Report of the Commission to Revise and Codify the Laws of the United States 118–119 (1906). The Commission's recommendation was adopted without change. The House and Senate Committee Reports, in identical language, stated its intended effect:

"The committee has deemed it wise to make those who are accessories before the fact at common law principal offenders, thereby permitting their indictment and conviction for a substantive offense.

"At common law an accessory can not be tried without his consent before the conviction or outlawry of the principal except where the principal and accessory are tried together; if the principal could not be found or if he had been indicted and refused to plead, had been pardoned or died before conviction, the accessory could not be tried at all. This change of the existing law renders these obstacles to justice impossible." S. Rep. No. 10, 60th

931–932 (CA9 1913). Congress manifested no intent to disturb this interpretation. See *Lorillard* v. *Pons,* 434 U. S. 575, 580 (1978).

Cong., 1st Sess., pt. 1, p. 13 (1908); H. R. Rep. No. 2, 60th Cong., 1st Sess., pt. 1, p. 13 (1908).[12]

And on the floor of the House of Representatives, Representative Moon, the Chairman of the Joint Select Committee, put the point simply: "We . . . have abolished the existing arbitrary distinction between felonies and misdemeanors." 42 Cong. Rec. 585 (1908).

This history plainly rebuts petitioner's contention that § 2 was not intended to authorize conviction of an aider and abettor after the principal had been acquitted of the offense charged.[13] With the enactment of that section, all participants in conduct violating a federal criminal statute are "principals." As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant.[14]

---

[12] Petitioner emphasizes the fact that the Committee Report fails to mention the common-law rule that the prior acquittal of a principal barred conviction of an accessory, and argues accordingly that Congress did not view that rule as an "obstacle to justice." The Court of Appeals correctly rejected this argument, being unwilling to "apply the canon of statutory interpretation . . . *expressio unius, exclusio alterius* . . . to the language employed in a *committee report.*" 610 F. 2d 1076, 1084 (CA3 1979) (emphasis added). We agree. Petitioner's argument would permit an omission in the legislative history to nullify the plain meaning of a statute. The language of § 2 abolishes the common-law categories and treats all parties as principals. It is not necessary for Congress in its committee reports to identify all of the "weeds" which are being excised from the garden.

[13] It bears mention that even prior to 1909 petitioner would not have prevailed in his attempt to bar prosecution on the § 7214 (a) (2) counts. As the Government notes, the version of 26 U. S. C. § 7214 then in effect defined the offense to be a misdemeanor. See Rev. Stat. § 3169 (1878). Hence, the prior acquittal of his principal would not have barred petitioner's prosecution. And because petitioner accompanied Niederberger on four of five trips and therefore was "present" at the scene of the crime, see Tr. 1018–1020, 1024–1027, 1034–1036, 1096, he could have been convicted at common law for those crimes even if the offense had been designated a felony.

[14] Nothing in *Shuttlesworth* v. *Birmingham*, 373 U. S. 262 (1963), relied on by petitioner, is to the contrary. There, petitioner had been con-

## B

The doctrine of nonmutual collateral estoppel was unknown to the common law and to the Congress when it enacted § 2 in 1909.[15] It emerged in a civil case in 1942, *Bernhard* v. *Bank of America Nat. Trust & Savings Assn.,* 19 Cal. 2d 807, 122 P. 2d 892. This Court first applied the doctrine in *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313 (1971). There, we held that a determination of patent invalidity in a prior infringement action was entitled to preclusive effect against the patentee in subsequent litigation against a different defendant. Just this past Term we again applied the doctrine—this time "offensively"—to hold that a defendant who had had a "full and fair" opportunity to litigate issues of fact in a civil proceeding initiated by the Securities and Exchange Commission could be estopped from relitigating those issues in a subsequent action brought by a private plaintiff. *Parklane Hosiery Co.* v. *Shore,* 439 U. S. 322 (1979). In both cases, application of nonmutual estoppel promoted judicial economy and conserved private resources without unfairness to the litigant against whom estoppel was invoked.

Here, petitioner urges us to apply nonmutual estoppel against the Government; specifically he argues that the Gov-

---

victed of aiding and abetting others to violate a city trespass ordinance which subsequently was declared constitutionally invalid. See *Gober* v. *Birmingham,* 373 U. S. 374 (1963). Shuttlesworth's case merely applied the rule that "there can be no conviction for aiding and abetting someone to do an innocent act." 373 U. S., at 265. Here, by contrast, the Government proved in petitioner's case that Niederberger had violated § 7214 (a) (2) in connection with each of the five trips. See n. 6, *supra.*

[15] In 1912, in *Bigelow* v. *Old Dominion Copper Co.,* 225 U. S. 111, 127, this Court stated that it was "a principle of general elementary law that the estoppel of a judgment must be mutual." See also *Stone* v. *Farmers Bank of Kentucky,* 174 U. S. 409 (1899); *Keokuk & Western R. Co.* v. *Missouri,* 152 U. S. 301, 317 (1894); *Litchfield* v. *Goodnow,* 123 U. S. 549, 552 (1887).

ernment should be barred from relitigating Niederberger's guilt under § 7214 (a)(2) in connection with the vacation trips to Pompano Beach, Miami, and Absecon. That issue, he notes, was an element of his offense which was determined adversely to the Government at Niederberger's trial.[16]

This, however, is a criminal case, presenting considerations different from those in *Blonder-Tongue* or *Parklane Hosiery*. First, in a criminal case, the Government is often without the kind of "full and fair opportunity to litigate" that is a prerequisite of estoppel. Several aspects of our criminal law make this so: the prosecution's discovery rights in criminal cases are limited, both by rules of court and constitutional privileges; it is prohibited from being granted a directed verdict or from obtaining a judgment notwithstanding the verdict no matter how clear the evidence in support of guilt, cf. Fed. Rule Civ. Proc. 50; it cannot secure a new trial on the ground that an acquittal was plainly contrary to the weight of the evidence, cf. Fed. Rule Civ. Proc. 59; and it cannot secure appellate review where a defendant has been acquitted. See *United States* v. *Ball,* 163 U. S. 662, 671 (1896).

The absence of these remedial procedures in criminal cases permits juries to acquit out of compassion or compromise or because of " 'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' " *Dunn* v. *United States,* 284 U. S. 390, 393 (1932), quoting *Steckler* v. *United States,* 7 F. 2d 59, 60 (CA2 1925). See generally H. Kalven & H. Zeisel, The American Jury

---

[16] Petitioner does not contend that the Constitution prevents the Government from prosecuting him on the three § 7214 (a)(2) counts as to which Niederberger was acquitted. Nothing in the Double Jeopardy Clause or the Due Process Clause forecloses putting petitioner on trial as an aider and abettor simply because another jury has determined that his principal was not guilty of the offenses charged. Cf. *Ashe* v. *Swenson,* 397 U. S. 436 (1970).

193–347 (ed. 1976).[17] It is of course true that verdicts induced by passion and prejudice are not unknown in civil suits. But in civil cases, post-trial motions and appellate review provide an aggrieved litigant a remedy; in a criminal case the Government has no similar avenue to correct errors. Under contemporary principles of collateral estoppel, this factor strongly militates against giving an acquittal preclusive effect. See Restatement (Second) of Judgments § 68.1 (Tent. Draft No. 3, 1976) (denying preclusive effect to an unreviewable judgment).[18]

The application of nonmutual estoppel in criminal cases is also complicated by the existence of rules of evidence and exclusion unique to our criminal law. It is frequently true in criminal cases that evidence inadmissible against one defendant is admissible against another. The exclusionary rule, for example, may bar the Government from introducing evidence against one defendant because that evidence was obtained in violation of his constitutional rights. And the suppression of that evidence may result in an acquittal.

---

[17] Niederberger's case demonstrates the point. As to the Absecon and Miami vacations, the jury convicted Niederberger of receiving something of value "because of any official act performed . . . by him," 18 U. S. C. § 201 (g), but acquitted him of receiving "any fee, compensation, or reward . . . for the performance of any duty," 26 U. S. C. § 7214 (a)(2). No explanation has been offered for these seemingly irreconcilable determinations. This inconsistency is reason, in itself, for not giving preclusive effect to the acquittals on the Absecon and Miami counts. See Restatement (Second) of Judgments § 88 (4) (Tent. Draft No. 3, 1976). See also 610 F. 2d, at 1112 (Gibbons, J., concurring in part and dissenting in part); *Harary* v. *Blumenthal,* 555 F. 2d 1113, 1116–1117 (CA2 1977).

[18] This is not to suggest that the availability of appellate review is always an essential predicate of estoppel. See *Johnson Co.* v. *Wharton,* 152 U. S. 252 (1894); see generally 1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.416 [5] (2d ed. 1974). The estoppel doctrine, however, is premised upon an underlying confidence that the result achieved in the initial litigation was substantially correct. In the absence of appellate review, or of similar procedures, such confidence is often unwarranted.

The same evidence, however, may be admissible against other parties to the crime "whose rights were [not] violated." *Alderman* v. *United States,* 394 U. S. 165, 171–172 (1969). Accord, *Rakas* v. *Illinois,* 439 U. S. 128, 134 (1978). In such circumstances, where evidentiary rules prevent the Government from presenting all its proof in the first case, application of nonmutual estoppel would be plainly unwarranted.[19]

It is argued that this concern could be met on a case-by-case basis by conducting a pretrial hearing to determine whether any such evidentiary ruling had deprived the Government of an opportunity to present its case fully the first time around. That process, however, could prove protracted and burdensome. Under such a scheme, the Government presumably would be entitled to seek review of any adverse evidentiary ruling rendered in the first proceeding and of any aspect of the jury charge in that case that worked to its detriment. Nothing short of that would insure that its opportunity to litigate had been "full and fair." If so, the "pretrial hearing" would fast become a substitute for appellate review, and the very purpose of litigation economy that estoppel is designed to promote would be frustrated.

Finally, this case involves an ingredient not present in either *Blonder-Tongue* or *Parklane Hosiery*: the important federal interest in the enforcement of the criminal law. *Blonder-Tongue* and *Parklane Hosiery* were disputes over private rights between private litigants. In such cases, no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue, and there is no sound reason for burdening the courts with repetitive litigation.

---

[19] Indeed, as the Court of Appeals observed, to give the first case preclusive effect would undermine the *Alderman* rule by affording a defendant whose rights were not violated the benefits of suppression. See 610 F. 2d, at 1094, n. 51.

That is not so here. The Court of Appeals opinion put the point well:

> "[T]he purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant. The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases and we are thus inclined to reject, at least as a general matter, a rule that would spread the effect of an erroneous acquittal to all those who participated in a particular criminal transaction. To plead crowded dockets as an excuse for not trying criminal defendants is in our view neither in the best interests of the courts, nor the public." 610 F. 2d, at 1093.

In short, this criminal case involves "competing policy considerations" that outweigh the economy concerns that undergird the estoppel doctrine. See Restatement (Second) of Judgments § 68.1 (e) and comments thereto (Tent. Draft No. 3, 1976); cf. *Commissioner* v. *Sunnen,* 333 U. S. 591 (1948).

### III

In denying preclusive effect to Niederberger's acquittal, we do not deviate from the sound teaching that "justice must satisfy the appearance of justice." *Offutt* v. *United States,* 348 U. S. 11, 14 (1954). This case does no more than manifest the simple, if discomforting, reality that "different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system." *Roth* v. *United States,* 354 U. S. 476, 492, n. 30 (1957). While symmetry of results may be intellectually satisfying, it is not required. See *Hamling* v. *United States,* 418 U. S. 87, 101 (1974).

Here, petitioner received a fair trial at which the Government bore the burden of proving beyond reasonable doubt that Niederberger violated 26 U. S. C. § 7214 (a)(2) and that petitioner aided and abetted him in that venture. He was entitled to no less—and to no more.

The judgment of the Court of Appeals is

*Affirmed.*