988 F.2d 123
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph Steven GAMBINA, Defendant-Appellant.
 No. 91-50779.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 2, 1993.
Decided March 10, 1993.
 
 Appeal from the United States District Court for the Central District of California; No. CR-89-0923-AWT-01; A. Wallace Tashima, District Judge, Presiding.
 C.D.Cal.
 AFFIRMED.
 Before BEEZER, BRUNETTI and DAVID R. THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 Ralph Steven Gambina was convicted of one count of kidnapping during extortion and armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d) and (e) (the Buena Park robbery); one count of kidnapping during attempted extortion and armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d) and (e) (the Torrance robbery); and two counts of use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). He appeals, contending that the district court committed reversible error in (1) making several evidentiary rulings; (2) refusing to admit the testimony of two proffered experts; (3) denying a discovery motion to require the government to turn over alleged Brady material; and (4) denying a motion for disclosure of grand jury material. He also contends his conviction should be reversed because he received ineffective assistance of counsel.
 
 
 3
 We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 FACTS
 
 4
 Four separate bank robberies are relevant to the issues presented here for review. Two, the Buena Park and Torrance robberies, led to the convictions on which this appeal is taken. The other two, the Des Moines and San Mateo robberies, were used to show Gambina's modus operandi to identify him.
 
 The Des Moines Robbery
 
 5
 In 1974, Gambina was convicted of a kidnap during extortion and armed bank robbery which occurred in Des Moines, Iowa in 1973. He was imprisoned until March 11, 1988. In preparation for the Des Moines robbery, Gambina had a female accomplice purchase multiple walkie-talkies. He also surveilled the victims, a bank president and his wife. The night before the robbery, he and a male accomplice entered the victims' house at gunpoint wearing wigs, makeup, sunglasses and gloves. During the evening Gambina talked about his experience in Vietnam. The next morning, the two robbers attached a fake bomb made from a walkie-talkie to the bank president and gave him a bag to fill with money. Gambina drove to the bank with the bank president in the bank president's car. After he got the money, Gambina left the car not far from the bank.
 
 The Buena Park Robbery
 
 6
 On August 28, 1988, Gambina and a male accomplice, carrying guns, entered the Sanchezes' apartment.[1] Mrs. Sanchez was an employee of the Security Pacific National Bank in Buena Park, California. The men wore wigs, facial disguises, multiple layers of clothes and gloves. They told Mrs. Sanchez they were there to rob Security Pacific. When she asked why she was chosen, one of the men named the bank manager and said that he was not at home. During that evening, the men expressed familiarity with Mrs. Sanchez's morning routine, used a walkie-talkie apparently to contact an accomplice, and expressed political views about the war in Vietnam. The men kept watch over the Sanchezes that night as they slept.
 
 
 7
 The next morning, the men gave Mrs. Sanchez a bag and told her to take it to the bank and fill it with $50 and $100 bills. They taped a device to her chest, telling her it was a remote control bomb which should only be removed by police. They told her to dress in loose clothing to conceal the device. They also told her that if she did not return with the money, they would kill Larry Kelly, Mrs. Sanchez's son. They handcuffed Mr. Sanchez to a bed. Gambina's accomplice handcuffed Kelly and left with him in the Sanchezes' pickup. Gambina rode with Mrs. Sanchez in her car. The two vehicles met up on the way to the bank and Gambina got in the one driven by his accomplice. Mrs. Sanchez proceeded to the bank.
 
 
 8
 While Mrs. Sanchez was in the bank the two men communicated with accomplices on the walkie-talkies and addressed each other by number, e.g., 1 to 2. Inside the bank, Mrs. Sanchez explained the situation to other employees who opened their cash drawers to allow her to fill the bag. After a time, Gambina entered the bank and was photographed by a surveillance camera. He ordered a bank officer to open an automatic teller machine and night deposit box to get more money. Some of the money put in the bag was bait money, but it was never linked to Gambina.
 
 
 9
 Gambina forced the bank officer to carry the bag to the pickup. He named the officer and the street he lived on, and then drove off in the pickup with his accomplice and Kelly. The men left Kelly handcuffed in the pickup truck a short distance from the bank. The police were notified and bomb experts removed the "bomb" from Mrs. Sanchez's chest. It turned out to be a Jobcom walkie-talkie with a quiet call module.
 
 The Torrance Robbery
 
 10
 On the morning of May 5, 1989, Pamela Sellars arrived at work at the Security Pacific Bank in Torrance, California. She had not stayed at home the night before. She parked her car in a parking structure behind the bank. As she got out, Gambina approached her with a gun in one hand and a Robinsons shopping bag in the other. He ordered her back into her car and he got in. He was wearing a wig, sunglasses, and gloves.
 
 
 11
 He attached a briefcase to Sellars's wrist with handcuffs and told her that it contained a bomb. He then gave her a duffle bag and told her to fill it with money from the bank. He told her that he was in contact with others, and that he had a police scanner. She saw the scanner. He said that he would hear it if she contacted the police. He told her he knew where her husband and children were, and gave her an address. The address was incorrect, and Sellars had no children. Gambina spoke as if talking into a microphone to someone. Sellars noticed that he appeared to be wearing headphones. Eventually he sent her into the bank.
 
 
 12
 Sellars explained the situation to the bank's next most senior officer, and told him to call the security department. She and the chief teller loaded the bag. When local police told her to take the bag out to the car, she did so. She discovered, however, that Gambina and the car were gone. The police removed the briefcase. It did not contain a bomb.
 
 
 13
 Sellars's car was found near the bank. It contained the wig, sunglasses, Robinsons shopping bag and police scanner. The sunglasses and the bag contained fingerprint. Two of three fignerprint experts who examined the prints identified them as belonging to Gambina. The third expert's examination was inconclusive.
 
 The San Mateo Robbery
 
 14
 On May 11, 1989, Gambina, carrying a gun, approached the Picoulins outside their home. He addressed them as Mr. and Mrs. Bell. Mabel Bell works with Mrs. Picoulin at the Bank of America in San Mateo, California. Gambina ordered the Picoulins into their home. He told them that accomplices had surveilled them, and he described Mr. Picoulin's last golf game. He wore a wig and dark skiing sunglasses. Mrs. Picoulin thought his mustache was fake. He complained about the election of President Bush and said that the banks would have to pay for having made money from the Vietnam war.
 
 
 15
 Gambina kept watch during the night. At one point, he went to a hallway and the Picoulins heard some conversation. He returned with a satchel for Mrs. Picoulin to fill with money the next day. During the night the Picoulins also saw him using a walkie-talkie, and heard him address others by number.
 
 
 16
 The next morning, Gambina ordered the Picoulins into their car. He got in and drove to the bank. He made some comments to Mrs. Picoulin about her normal route, indicating that he knew it. When they arrived at the bank, they drove into the parking structure and waited for Mrs. Bell.
 
 
 17
 When she arrived, Gambina drove the car up behind Mrs. Bell's car and told Mrs. Picoulin to get out and explain what was going on. Mrs. Picoulin did so. Gambina then told them that they had fifteen minutes to return with the bag full of money or he would kill Mr. Picoulin.
 
 
 18
 Inside the bank, Mrs. Picoulin and Mrs. Bell had an employee fill the satchel with money. They placed bait money and smaller bills on the bottom. Mrs. Picoulin then left the bank and found the car pulling up at the door. Gambina ordered her to get in with the money. He then drove to the lower level of the parking structure, got out of the car with the satchel and ran up the stairs to the street. In the Picoulins' car police found a walkie-talkie and a pair of sunglasses left by Gambina. The sunglasses contained a fingerprint which one expert testified matched Gambina's. In addition, Mrs. Picoulin identified Gambina in a photospread and Mr. Picoulin identified him at trial.
 
 Tracing the Gambinas
 
 19
 The walkie-talkie from the Buena Park robbery had no serial number, but police traced it to an electronics shop. A woman using the name M. Dawson had purchased six of them. She had given her address as: 467 Valley Street, Maplewood, New Jersey. A resident of the apartment building at that address and a car salesman who worked nearby identified the man in the bank surveillance photo as Jack Dawson. At trial the salesman identified Gambina as the man he knew as Jack Dawson. Kelly also identified Gambina as the man in the bank photograph. In addition, the Maplewood apartment was rented to Ralph and Julie Gambina.
 
 
 20
 Beginning in May 1988, approximately two months after Gambina got out of prison for the Des Moines bank job, he and Julie Gambina had several plastic surgeries to alter their faces and fingerprints. Using various names, they bought a number of cars and rented a number of residences in several states. Most notably, on February 2, 1989, using the names Shawn Dallas and Fawn Franco, they bought a Trans Am from a dealership in Hollywood, Florida. For this purchase Gambina used a New Jersey license with the name Shawn Dallas and the Maplewood address on it.
 
 Arrest and Trial
 
 21
 On June 2, 1989, the Gambinas were arrested at one of their residences, in Elgin, Illinois. Julie Gambina consented to a search of the premises. Police found several loaded guns, false identifications in some of the names that the Gambinas used and equipment for making false identifications. They also found a suitcase containing $119,000, including 200 $1 bait bills from the San Mateo robbery. Finally, they found wigs, dark clothing, fake mustaches, beards and bulletproof vests.
 
 
 22
 Beginning January 15, 1991, Gambina was tried with Julie Gambina on two counts of kidnapping during extortion and armed bank robbery (an earlier robbery at a different bank in Torrance, California and the Buena Park robbery), one count of kidnapping during attempted extortion and armed bank robbery (the Torrance robbery), three counts of using a firearm during a crime of violence and one count of conspiracy to kidnap during extortion and armed bank robbery. The jury hung on the conspiracy counts against the two, and on the substantive counts against Gambina, but acquitted Julie Gambina on the substantive counts. The court then acquitted Julie Gambina on the conspiracy charge.
 
 
 23
 Thereafter, the government dropped the conspiracy count against Gambina as well as the two substantive counts relating to the earlier Torrance robbery, and retried him beginning July 9, 1991. This time he was convicted on the four remaining counts, two for carrying a firearm during a crime of violence and one attempted and one successful kidnap during extortion and armed bank robbery (the Torrance and Buena Park robberies).
 
 DISCUSSION
 
 24
 A. Relevance of Evidence of Actions of Julie Gambina
 
 
 25
 Gambina contends the district court committed reversible error in admitting evidence of Julie Gambina's purchases of the walkie-talkies.[2] He presents two arguments for excluding this evidence. He contends that although the evidence is conditionally relevant under Federal Rule of Evidence 104(b), there are two unmet conditions to its relevance: (1) that Gambina knew Julie Gambina purchased the walkie-talkies; and (2) that Gambina was linked with the walkie-talkies. He also contends Julie Gambina's acquittal makes evidence of her purchases of the walkie-talkies inadmissable. He contends it "is tantamount to a finding that she was not guilty of the overt acts." We review for abuse of discretion a district court's decision regarding relevance of evidence. United States v. Schaff, 948 F.2d 501, 505 (9th Cir.1991); United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989).
 
 
 26
 We reject Gambina's conditional relevance argument. Relevance depends on whether evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Here, there was evidence that Gambina used the same address in New Jersey as Julie Gambina, and evidence that walkie-talkies were used in the robberies. Evidence that Julie Gambina bought the walkie-talkies used makes it more probable that Gambina participated in the robberies. This is true regardless of whether the two conditions cited by Gambina are fulfilled.
 
 
 27
 The argument that Julie Gambina's acquittal makes the evidence inadmissible is also meritless because her acquittal merely means that she was not proven guilty beyond a reasonable doubt. See Dowling v. United States, 493 U.S. 342, 348-50 (1990). The evidence that she bought the walkie-talkies need not be so strong as to establish that fact beyond a reasonable doubt; it is enough that the evidence of her purchases exists and tends to make it more probable that Gambina was involved in the robberies than it would be without the evidence. Fed.R.Evid. 401; see also Comment to Fed.R.Evid. 401 (quoting Professor McCormick on the difference between what is required for admission and what is required for verdict or conviction: "A brick is not a wall.").
 
 
 28
 We conclude that the district court did not abuse its discretion in admitting the evidence over Gambina's relevancy objection.[3]
 
 B. Collateral Estoppel
 
 29
 Gambina contends the evidence that Julie Gambina bought the walkie-talkies and that he and she also bought a 1986 Trans Am was admitted in error because Julie Gambina's acquittal collaterally estops the government from reproving these purchases. We review Gambina's collateral estoppel argument de novo. United States v. Seley, 957 F.2d 717, 720 (9th Cir.1992).
 
 
 30
 This is a case of "non-mutual collateral estoppel." The Supreme Court has held that non-mutual collateral estoppel does not apply against the government in criminal prosecutions. Standefer v. United States, 447 U.S. 10, 21-24 (1980); see also United States v. Bernhardt, 840 F.2d 1441, 1450-1452 (9th Cir.), cert. denied, 488 U.S. 954 (1988).
 
 
 31
 In Standefer, the defendant was charged, among other things, with five counts of aiding and abetting an IRS agent in violation of 26 U.S.C. § 7214(a)(2) (generally prohibiting an agent from accepting bribes). Standefer, 447 U.S. at 12. The agent was also charged with, among other things, five counts of violating section 7214(a)(2). Id. The agent was acquitted of three of the section 7214(a)(2) counts and the trial of Standefer followed. Id. at 13. He was convicted of aiding and abetting on all five of the section 7214(a)(2) counts and appealed arguing that the agent's acquittal collaterally estopped the government from proving the three counts. Id. at 13-14.
 
 
 32
 The Court rejected the argument. It noted the claim was one of non-mutual collateral estoppel because the parties were different in the two cases. Id. at 21. It held that in a criminal case it is inappropriate to use non-mutual collateral estoppel against the government because the government often will not have had a full and fair opportunity to litigate the contested issue in the predicate case. Id. at 22.[4] It pointed to exclusionary rules which may apply with one party but not another, and to the inability of the government to appeal rulings and even clearly erroneous verdicts. Id. at 22-24.
 
 
 33
 The Court also rejected the suggestion that trial courts hold pretrial hearings to determine, on a case-by-case basis, whether the government had a full and fair opportunity to litigate an issue. The Court said:
 
 
 34
 That process ... could prove protracted and burdensome. Under such a scheme, the Government presumably would be entitled to seek review of any adverse evidentiary ruling rendered in the first proceeding and of any aspect of the jury charge in that case that worked to its detriment. Nothing short of that would insure that its opportunity to litigate had been "full and fair." If so, the "pretrial hearing" would fast become a substitute for appellate review, and the very purpose of litigation economy that estoppel is designed to promote would be frustrated.
 
 
 35
 Id. at 24. In short, the Court effectively prohibited all non-mutual collateral estoppel against the government in criminal cases.
 
 
 36
 Gambina's contention here falls within this prohibition. Despite the fact that Gambina was a codefendant in the earlier case in which Julie Gambina was acquitted, the concerns expressed by Chief Justice Burger in Standefer are fully applicable. Among them is the fact that the government had no opportunity to appeal rulings which may have contributed to Julie Gambina's acquittal. We reject Gambina's argument that the government was collaterally estopped from proving the purchases of the walkie-talkies and Trans Am automobile.
 
 
 37
 C. Admission of Evidence Regarding the San Mateo Robbery
 
 
 38
 Gambina contends the admission of evidence of the uncharged, subsequent San Mateo bank robbery violated Federal Rules of Evidence 401, 403 and 404(b). We review a district court's decisions balancing the probative value of evidence against its prejudicial effect for abuse of discretion. United States v. Perkins, 937 F.2d 1397, 1400 (9th Cir.1991). We also review decisions regarding admission of evidence under Rule 404(b) for abuse of discretion. United States v. Mundi, 892 F.2d 817, 820 (9th Cir.1989), cert. denied, 111 S.Ct. 1072 (1991).
 
 
 39
 Under Rule 404(b), evidence of other bad acts is not generally admissible. It may be, however, to show identity. Fed.R.Evid. 404(b). The government contends that evidence of the San Mateo robbery showed Gambina's modus operandi and tied him to the charged crimes. For evidence of other criminal conduct to be admitted to show identity, the following requirements must be met: (1) there must be proof sufficient for a reasonable jury to find the defendant committed the other act, Huddleston v. United States, 485 U.S. 681, 689 (1988); (2) the other act must not be too remote in time from the commission of the crime charged; (3) the other act must be similar to the act charged; and (4) the other act must be introduced to prove an element of the charged offense material to the case. United States v. Bailleaux, 685 F.2d 1105, 1110 (9th Cir.1982).
 
 
 40
 Here all four criteria are satisfied. There was sufficient evidence for a jury to find that Gambina committed the San Mateo robbery. Mrs. Picoulin picked him from a photospread, and declined to pick anyone from a spread offered which did not contain a picture of Gambina. In addition, Mr. Picoulin identified Gambina at trial. Gambina also left sunglasses in the Picoulins' car. There were fingerprints on the sunglasses and at trial Thurmon Williams testified the fingerprints matched Gambina's. Gambina argues that Williams' testimony was unreliable, but that determination was for the jury.
 
 
 41
 The final three elements of the Rule 404(b) test are also satisfied. The San Mateo robbery occurred after the crimes of which Gambina was convicted, and only six days after one of them. Also, the evidence was offered as probative of a material fact. It was offered to show a distinctive modus operandi used in all three robberies. All were bank robberies involving robbers wearing wigs, sunglasses and false facial hair. In all three robberies, the robbers carried walkie-talkies which they appeared to use to communicate with accomplices. They also provided a bag for the victim to carry the money. In addition, in both the San Mateo and the Buena Park robberies the robbers invaded the victim's home the night before and held a family member hostage to ensure that the victim would comply with the demand for money.[5] As all four elements are satisfied, the evidence of the San Mateo robbery was properly admitted over Gambina's Rule 404(b) objection.
 
 
 42
 Nonetheless, Gambina contends the evidence should have been excluded under Rule 403 because it was substantially more prejudicial than probative. The prejudice was obvious. Evidence of an uncharged crime, of which Gambina had never been convicted, might have induced the jury to infer that Gambina was a person of bad character who was likely to have committed the charged crimes in accordance with that character. See United States v. Johnson, 820 F.2d 1065, 1069 (9th Cir.1987) ("Prejudice will always arise upon the admission of evidence of a defendant's criminal conduct."); Bailleaux, 685 F.2d at 1109 (the danger of prejudice "exists whenever a jury is advised of the fact of a prior conviction, or evidence relating to earlier criminal conduct is admitted"); Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").
 
 
 43
 The district court's decision to admit the evidence, however, was within its discretion. Abuse of discretion is a deferential standard,[6] and the evidence must be substantially more prejudicial than probative to be excluded. Fed.R.Evid. 403. This it is not. The modus operandi is distinctive and probative of identity.
 
 
 44
 We have rejected Rule 403 challenges to the admission of other crimes evidence when the evidence was considerably less probative. In Johnson, for example, we rejected such a challenge where the only similarity between two bank robberies was the criminal's habit of requesting change from a bank teller before robbing him or her. Johnson, 820 F.2d at 1070.
 
 
 45
 We conclude that the district court was within its discretion in finding that the evidence of the San Mateo robbery was not substantially more prejudicial than probative.
 
 D. Admission of Gambina's 1973 Conviction
 
 46
 Gambina next contends the district court abused its discretion by admitting evidence of his conviction for the 1973 Des Moines bank robbery. He presents this argument under Rule 403, but it more accurately falls under Rule 404(b). His only contention is that the 1973 bank robbery conviction was too remote in time to be admitted. We review Rule 404(b) decisions for abuse of discretion. United States v. Mundi, 892 F.2d 817, 820 (9th Cir.1989), cert. denied, 111 S.Ct. 1072 (1991).
 
 
 47
 The 1973 conviction was quite remote, eighteen years. However, consistent with the analysis we articulated in United States v. Spillone, 879 F.2d 514 (9th Cir.1989), cert. denied, 111 S.Ct. 210 (1990), we conclude that the district court did not abuse its discretion in admitting evidence of this conviction. In Spillone, we approved the admission of a prior conviction for making an extortionate extension of credit, despite the fact that the conviction was at least ten years old. With regard to the remoteness of the conviction, we said:
 
 
 48
 Courts have seldom discussed the proper way to evaluate a defendant's objection that a prior bad act or conviction is too remote. The Seventh Circuit has suggested that remoteness must be considered in conjunction with other factors. "Questions about 'how long is too long' do not have uniform answers; the answers depend on the theory that makes the evidence admissible." United States v. Beasley, 809 F.2d 1273, 1277 (7th Cir.1987). We agree with the Seventh Circuit and decline to adopt an inflexible rule excluding evidence of prior bad acts after a certain amount of time elapses. Depending upon the theory of admissibility and the similarity of the acts, for example, some remote acts may be extremely probative and relevant.
 
 
 49
 Spillone, 879 F.2d at 519.
 
 
 50
 Here, the similarity between the charged robberies (the Buena Park robbery and the Torrance robbery), the uncharged San Mateo robbery, and the 1973 Des Moines robbery is extraordinary. Like the 1973 Des Moines robbery, the Buena Park and San Mateo robberies involved taking a bank employee and spouse hostage and strapping a fake bomb to the employee and bringing the employee to the bank to get the money. In addition, all three involved robbers holding one of the bank employee's family members hostage, and threatening to kill him or her if the employee did not return with a bag full of money. In all four robberies, Gambina and his accomplices wore wigs, sunglasses, and theatrical makeup. Gambina used a walkie-talkie to make a fake bomb in all but the Torrance robbery, and even that one involved a fake bomb. In all four robberies, Gambina discussed his experience in Vietnam, and in three of them he and his accomplices invaded the victims' homes the night before the robbery. In the fourth, the Torrance robbery, Sellars was not at home the night before.
 
 
 51
 We conclude that the district court did not abuse its discretion in admitting evidence of the 1973 Des Moines bank robbery conviction.
 
 E. Testimony of Expert Witnesses
 
 52
 Next Gambina contends that it was reversible error to exclude the testimony of his two proffered expert witnesses. The first witness he proffered was a professor of fashion, clothing design, and fashion and clothing marketing. The government contended that the shirt Gambina wore in his picture on the driver's license used to buy the car in Hollywood, Florida was the same shirt worn by the robber in the bank surveillance photo from the Buena Park robbery. Gambina wanted to elicit testimony from his expert describing differences between the shirts, and the distribution patterns of the types of shirts involved. The second witness he proffered was Joseph Dougherty, a convicted bank robber. Gambina wanted Dougherty to testify that Gambina's modus operandi was not unique.
 
 
 53
 Expert testimony is admissible "if the subject matter at issue is beyond the common knowledge of the average layman, the witness has sufficient expertise, and the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion." United States v. Winters, 729 F.2d 602, 605 (9th Cir.1984). We do not disturb the decision of a trial judge to exclude expert testimony unless manifestly erroneous. United States v. Cuevas, 847 F.2d 1417, 1429 (9th Cir.1988), cert. denied, 489 U.S. 1012 (1989).
 
 
 54
 The testimony of the fashion professor had two possible uses for Gambina. It may have lead the jurors to conclude that the shirts were different. Alternatively, it may have lead them to conclude that the type of shirt was quite common. Neither theory required expert testimony. Whether a style of shirt is common is within the knowledge of the average layperson, and so is not a question which justifies expert testimony. Similarly, how likely two photos of shirts are to be photos of the same shirt is not an inquiry that is aided much by the expert testimony offered.
 
 
 55
 Gambina's reliance on United States v. Collins, 559 F.2d 561 (9th Cir.), cert. denied, 434 U.S. 907 (1977), is misplaced. While the expert in Collins was allowed to testify to the similarity of shoes and a briefcase in two photos, he was qualified as a FBI expert in photographic comparison. Id. at 565. The expert offered here claimed no expertise making her especially proficient at comparing the two photos of shirts. The district court did not commit manifest error by excluding the proffered testimony of Gambina's fashion expert.
 
 
 56
 The refusal to admit the proffered testimony of Dougherty was likewise not manifest error. Gambina argues that Dougherty would have testified that he used a similar modus operandi, that he had heard of others using a similar modus operandi, and that he had discussed his modus operandi on television. These matters are not proper subjects of expert testimony, nor are they relevant. Dougherty's own use of similar methods is testimony from personal knowledge, and irrelevant because he was in prison and could not have committed the crimes in question. His "knowledge" that others used similar methods is hearsay and anecdotal. It is insufficiently reliable to be admitted. Finally, that he discussed his methods on television is irrelevant as it would require pure speculation for the jury to infer from this that others used Gambina's bank robbing methods. The district court did not err in excluding Dougherty's testimony.
 
 F. Brady Argument
 
 57
 Gambina argues that under Brady v. Maryland, 373 U.S. 83 (1963), he was entitled to information relating to three other persons who were included in photospreads used by the FBI and who had their fingerprints run along with him. We review de novo a district court's ruling on a contention that the prosecutor breached a duty to produce evidence under Brady. United States v. Monroe, 943 F.2d 1007, 1012 (9th Cir.1991), cert. denied, 112 S.Ct. 1585 (1992).
 
 
 58
 To obtain relief for the alleged withholding of Brady material, we require that a defendant show that allegedly withheld material "might have affected the outcome of the trial." United States v. Williams, 898 F.2d 1400, 1402-03 n. 2 (9th Cir.1990); United States v. Gillespie, 852 F.2d 475, 481 (9th Cir.1988). Gambina has failed to meet this burden. Moreover, the government turned over what he appears to be asking for. It provided the names of the persons to whom photospreads were shown, the reports of those viewings, handwritten notes concerning those reports, photocopies of the photographs in the photospreads, and the names of many of the persons whose photographs were used in photospreads. In addition, it turned over the names of the three others whose fingerprints were run. Gambina points to nothing specific that the government failed to turn over, nor does he say how anything allegedly withheld may have affected the outcome of his trial.
 
 
 59
 The Sixth Circuit addressed a similar situation in United States v. Frost, 914 F.2d 756 (6th Cir.1990). There the defendant "fail[ed] to specifically identify the material allegedly withheld." Id. at 771. The court noted that "if the government does fail to disclose Brady material, the defendant has a constitutional remedy for the nondisclosure only if the defendant can show that there is a reasonable probability that 'the omission deprived the defendant of a fair trial.' " Id. (quoting United States v. Agurs, 427 U.S. 97, 108 (1976); United States v. Presser, 844 F.2d 1275, 1281-82 (6th Cir.1988)) (emphasis in Presser ). Because the defendant had not identified the material he wanted, he had not met his burden. Id.
 
 
 60
 Here, Gambina has failed, as in Frost, to identify any specific material that wasn't turned over to him, and has failed to show how the outcome of his trial would have been affected by what he contends was a Brady violation.
 
 G. Production of Grand Jury Transcript
 
 61
 Next Gambina contends the grand jury transcripts might have contained information useful to impeach witnesses at trial and that it was reversible error for the district court to refuse to order them turned over. The district court's decision is reviewed for abuse of discretion. United States v. Plummer, 941 F.2d 799, 806 (9th Cir.1991).
 
 
 62
 In order to obtain grand jury transcripts under Federal Rule of Criminal Procedure 6(e)(3)(C)(i), a defendant must demonstrate "particularized need." Dennis v. United States, 384 U.S. 855, 870 (1966); United States v. Walczak, 783 F.2d 852, 857 (9th Cir.1986). Particularized need can be shown where grand jury records are necessary for a participant in a trial to impeach witnesses, Petrol Stops Northwest v. United States, 571 F.2d 1127, 1130 (9th Cir.1978), rev'd on other grounds, Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979), but more than a desire for a "fishing expedition" is required. United States v. Kim, 577 F.2d 473, 478 (9th Cir.1978); Petrol Stops, 571 F.2d at 1131.
 
 
 63
 In Walczak, the defendant wanted to obtain the grand jury transcripts "to determine whether the testimony of law enforcement officers improperly summarized the testimony of other agents." Walczak, 783 F.2d at 857. We noted that the defendant had alleged no facts to support his suspicion that the transcripts would provide such impeachment material and described his contention as "speculative." Id. As a result, we concluded that the district court had not abused its discretion in denying the request for discovery. Id.
 
 
 64
 This case is similar. Gambina has alleged no facts suggesting that the grand jury transcripts contain statements useful to impeach the government's witnesses. He merely wants to see if they do. As in Walczak, the district court was within its discretion in determining that this did not rise to the level of particularized need.
 
 H. Ineffective Assistance of Counsel
 
 65
 Finally, Gambina contends that he suffered ineffective assistance of counsel because his attorney refused to call Julie Gambina to the stand. Whether a defendant received ineffective assistance of counsel is reviewed de novo. United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir.1991); United States v. Signori, 844 F.2d 635, 638 (9th Cir.1988).
 
 
 66
 Objections to the effectiveness of defense counsel are generally heard on collateral attack under 28 U.S.C. § 2255. United States v. Kazni, 576 F.2d 238, 242 (9th Cir.1978). The collateral proceeding is preferred because it allows development of a record showing what counsel did, why, and what, if any, prejudice resulted. United States v. Pope, 841 F.2d 954, 958 (9th Cir.1988). We can, however, consider such contentions on direct appeal if the record is sufficiently complete. United States v. O'Neal, 937 F.2d 1369, 1376 (9th Cir.1991). Here the record is more than sufficient to conclude that Gambina's attorney's decision not to call Julie Gambina as a witness did not rise to the level of ineffective assistance of counsel.
 
 
 67
 Analysis of an ineffective assistance of counsel contention requires a two step approach:
 
 
 68
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 69
 Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Morris v. California, 966 F.2d 448, 454 (9th Cir.), cert. denied, 113 S.Ct. 96 (1992). Gambina's contention fails both prongs of the Strickland test.
 
 
 70
 Gambina's counsel's decision not to call Julie Gambina was a reasonable tactical decision. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.1984) ("reasoned tactical decisions are not faulted, even if in retrospect better tactics were available") (citing United States v. Stern, 519 F.2d 521, 524-25 (9th Cir.), cert. denied, 423 U.S. 1033 (1975)), cert. denied, 469 U.S. 838 (1984). Julie Gambina had been convicted of a burglary which involved deceit and of aggravated perjury. Both of these had been ruled admissible to impeach her. In light of this, the credibility of whatever testimony she offered would have been significantly diminished. Moreover, given the evidence of her involvement with Gambina and his crimes, Gambina's attorney might very reasonably have concluded that exposing Julie Gambina to cross-examination would have been more prejudicial to Gambina's case than her testimony on direct would have been helpful. Counsel's decision was not below the standard guaranteed by the Sixth Amendment, nor was Gambina prejudiced by it.
 
 
 71
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Gambina's defense was that he had been falsely identified as the robber in the Buena Park, Torrance and San Mateo bank robberies. Because Gambina was convicted of the Buena Park and Torrance bank robberies, and there was ample evidence that he committed the San Mateo bank robbery, we use his name in the recitation of facts
 
 
 [2]
 He also mentions evidence of "telephone calls, and purchases." He never identifies what telephone calls and purchases he is referring to, however, and never explains why their admission was error
 
 
 [3]
 Gambina also argues Federal Rule of Evidence 403 was violated because the evidence was substantially more prejudicial than probative. He does not, however, point to any unfair prejudice and we find none
 
 
 [4]
 The full and fair opportunity to litigate an issue is a general requirement for the use of collateral estoppel. Bernhardt, 840 F.2d at 1448; United States v. Hernandez, 572 F.2d 218, 220 (9th Cir.1978)
 
 
 [5]
 These similarities also demonstrate why the evidence was relevant and why Gambina's Rule 401 claim fails. Rule 401 requires only that "evidence hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the similarity of the San Mateo robbery makes it more probable that Gambina committed the two charged robberies
 
 
 [6]
 It requires that the reviewing court be left " 'with the definite and firm conviction that the [district] court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors.' " United States v. Egbuniwe, 969 F.2d 757, 761 (9th Cir.1992) (quoting United States v. BNS, Inc., 858 F.2d 456, 464 (9th Cir.1988))