NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0148n.06

No. 08-1946

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Mar 10, 2010**
LEONARD GREEN, Clerk

STACEY INGRAM,

        Petitioner-Appellant,

v.

CLARICE STOVALL,

        Respondent-Appellee.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:    SUHRHEINRICH, SUTTON, and COOK, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.**  Petitioner Stacey Ingram ("Ingram") appeals the district court's denial of her petition of writ of habeas corpus following her conviction for first-degree felony murder under Michigan law.  We **AFFIRM**.

## I.  Background

Ingram and her cousin Mario Ingram ("Mario") were jointly tried in 1999 before separate juries for the murder of Natalie Grillo ("Grillo").[1]  Ingram's conviction was based largely on her written confession, which was introduced at trial.

In her confession, Ingram described the sequence of events on the night of the murder.  She was at her cousin Mario's house in Clinton Township, Michigan, and told Mario that she needed a ride home.  Mario called Grillo.  Grillo arrived in a 1989 blue Plymouth Sundance.  She had her

---

[1]The medical examiner testified that Grillo died from ligature strangulation and that the cause of death was homicide.

three-year old daughter with her. Ingram sat in the back seat with the little girl and Mario sat up front. Grillo drove directly to Ingram's house in Detroit, Michigan. When they got there, Ingram asked Mario if Grillo could take her somewhere to get something to eat. They drove to a Coney Island, which was closed. They then drove to a different location, where Ingram got out and retrieved a bag of marijuana.

When Ingram returned to the vehicle, Mario indicated that he wanted her to ride in front, and he got into the back seat. As they headed back to Ingram's home, Mario told Grillo to stop a couple of houses from Ingram's house. He then reached into the front seat with speaker headset wires and tried to choke Natalie. When the wire broke, he reached into the front seat, put his arm around Grillo's neck, and began pulling her into the rear seat. Grillo fought at first, tried to open the front door, and managed to pull the lock up. Ingram reached over and locked the door, and also put the car into park "so that it wouldn't drive off." Grillo stopped struggling in less than five minutes. Ingram felt Grillo's neck and found no pulse. She told Mario that Grillo was dead. They dropped Grillo's daughter off on a stranger's porch. Mario drove first to Belle Isle, and then to Erma Henderson Park, where they dumped the body.

Mario told Ingram to hand him Grillo's wallet. She took $41 out of the wallet and gave Mario the money. Mario gave her $1 in return. Ingram kept the wallet. Mario took Grillo's purse and found a credit card in it. The next day Ingram and Mario used the credit card at several local drive-thru banks. Mario tried unsuccessfully, but Ingram was able to withdraw five $20s. Mario took $60 and gave Ingram $40. They drove back to Ingram's house. Ingram kept the car.

When asked, "Was there anything said about hurting Natailie [2] while you were inside the car with Mario?" Ingram answered, "Mario had told me that he was going to ask Natailie for some

_____

[2]This is the spelling employed throughout the transcripts.

money. This was when we first pulled up to my house. Mario said this [to] me so that Natailie couldn't hear–said this to me so Natailie couldn't hear." Ingram also wrote in "outside of the car" on the confession paper.

Ingram was convicted of first-degree felony murder on an aiding and abetting theory and second-degree murder as a lesser-included offense of first-degree premeditated murder. The second-degree murder conviction was subsequently vacated and Ingram was sentenced to life imprisonment on the felony murder conviction. Mario was convicted of second-degree murder at the same trial, but by a different jury.[3]

The Michigan Court of Appeals affirmed Ingram's conviction. It ruled in relevant part as follows:

> In the present case, the medical examiner's testimony was sufficient to prove that the victim's death was the result of a criminal agency (ligature strangulation). Thus, the corpus delicti for felony-murder was established. In her statement to the police, Stacey Ingram stated that she knew that Mario Ingram was going to ask the victim for money, and changed seats with him before the fatal assault. When Mario Ingram began strangling the victim, Stacey Ingram assisted him by putting the car in park and relocking the car door after the victim managed to unlock it. After the victim was dead, Stacey Ingram took money out of her wallet and shared it with Mario Ingram, helped Mario Ingram place tape on the victim's mouth and nostrils, helped Mario dispose of the victim's body and abandon the victim's child, kept the victim's car and wallet, and obtained cash for herself and Mario Ingram using the victim's ATM card. Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a rationale [sic] trier of fact to find beyond a reasonable doubt that Stacey Ingram assisted Mario Ingram with knowledge that Mario intended to kill the victim during the course of a larceny.

---

[3]Ingram and Mario were originally charged with alternative theories of first-degree premeditated murder and felony murder. Prior to trial, Mario's attorney moved to quash the felony murder charge against Mario. The trial court granted the motion as to the felony murder charge, finding that there was not sufficient evidence from Mario's statement to indicate a larcenous intent and to bind over on felony murder. The trial court denied Mario's motion to quash the first-degree premeditated murder charge. The trial court denied Ingram's motions to quash, finding probable cause to bind her on both the felony murder and first-degree premeditated murder charges.

*People v. Ingram*, No. 223970, 2002 WL 31956964, at \*1 (Mich. Ct. App. Dec. 20, 2002) (per curiam). The Michigan Supreme Court denied Ingram's application for leave to appeal. *People v. Ingram*, 666 N.W.2d 671 (Mich. 2003) (table). State post-conviction relief was also denied. Ingram then filed this petition for writ of habeas corpus. The district court denied Ingram's request and declined to issue a certificate of appealability.

The district court held that "there was sufficient direct and circumstantial evidence for a rational trier of fact to conclude that [Ingram] aided and abetted in the commission of a felony murder" based on the fact that she "told the police that she knew that her co-defendant Mario Ingram was going to ask the victim for money and she further acknowledged changing seats with her co-defendant prior to the assault." *Ingram v. Stovall*, No. 2:06-CV-14955, 2008 WL 2605078, at \*5 (E.D. Mich. June 30, 2008). Further, when Mario began strangling the victim, Ingram placed the car in park and relocked the door after Grillo unlocked it during the struggle. *Id.* The district court further concluded that there was sufficient evidence to establish that Ingram was aware of Mario's larcenous intent prior to the homicide, based on the fact that "Petitioner told the police that she was aware that Mario Ingram was going to ask the victim for money prior to the assault. Petitioner took money from the victim immediately after the assault and ultimately retained both the victim's car and wallet." *Id*.

## II. Analysis

The district court's decision to deny habeas corpus relief is reviewed de novo. *Tucker v. Palmer*, 541 F.3d 652, 655 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 109 (2009). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus shall not be granted unless a petitioner shows that the state's adjudication of the claim is "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "'A state-court decision is an unreasonable application of clearly established federal law if it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Tucker*, 541 F.3d at 656 (quoting *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007) (quoting *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000) (internal quotation marks omitted))). "When assessing unreasonableness, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. (quoting *Parker*, 506 F.3d at 448 (quoting *Williams*, 529 U.S. at 411) (internal quotation marks omitted)).

Ingram contends that there was insufficient evidence to convict her of felony murder because there was no evidence that she formed the intent to commit or aid and abet larceny prior to or during the murder. She further claims that no inferences could be drawn from acts prior to or during the murder regarding her intent to commit larceny. She therefore argues that the state court adjudication was an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979), and an unreasonable determination of the facts. She asks that her felony murder conviction be vacated and her second-degree murder conviction be reinstated.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [she] is charged." *In*

*re Winship*, 397 U.S. 358, 364 (1970). *Jackson* established the test for determining whether the evidence is sufficient to support a conviction under the *Winship* standard.

> *Jackson* held:
>
> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Jackson*, 443 U.S. at 318-19 (footnotes and internal citations omitted).

The issue in this case, then, as framed by the AEDPA, is whether the district court erred in concluding that the state court reasonably applied *Jackson*. *See Tucker*, 541 F.3d at 656. Deference is due at two levels in this case: "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id*. This is done "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.

Ingram was convicted of first-degree felony murder under an aiding and abetting theory. The felony murder doctrine requires that a defendant intended to commit the underlying felony at the

time the homicide was committed.[4]  *People v. Brannon*, 486 N.W.2d 83, 85-86 (Mich. Ct. App. 1992).  The doctrine does not apply if the intent to commit the underlying felony is not formed until after the homicide occurs.  *Id.* at 86.  In addition, the defendant must have, and the state must prove, the intent to commit both the underlying felony and the murder.  *People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980).

Here the enumerated felony was attempted larceny.  Larceny is defined as "the taking and carrying away of the property of another, done with felonious intent and without the owner's consent."  *People v. Malach*, 507 N.W.2d 834, 836 (Mich. Ct. App. 1993); *see also* Mich. Comp. Laws § 750.356.

---

[4]The elements of felony murder under Michigan law are:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the felony murder statute, Mich. Comp. Laws § 750.316].

*People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999) (quoting *People v. Turner*, 540 N.W.2d 728, 566 (Mich. Ct. App. 1995), *overruled in part on other grounds by People v. Mass*, 628 N.W.2d 540 (Mich. 2001)).  This includes "perpetration of, or attempt to perpetrate . . . larceny of any kind." Mich. Comp. Laws § 750.316(1)(b).

Aiding and abetting under Michigan law requires proof that

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*Carines*, 597 N.W.2d at 135. "An aider and abettor's state of mind may be inferred from all the facts and circumstances.  Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime."  *Id.* (citing *Turner*, 540 N.W.2d at 734).

Ingram claims that the only alleged evidence submitted to the jury as to her knowledge of Mario's intent to commit larceny was Mario's statement to Ingram that he intended to ask Grillo for money. Ingram argues that, absent any language indicating a theft or a taking without the owner's permission, the statement is insufficient by itself. In addition, Ingram claims that she had no reason to suspect or anticipate that Mario would kill the victim. Rather, the evidence showed only that Mario acted spontaneously and without warning, that she was merely present, and that larceny was merely an afterthought.

Even if, as Ingram suggests, it was not unusual for Mario to ask a friend for money, and even if it was not unusual for Mario to reveal his intent privately to Ingram, it is unusual for a friend to choke a friend from behind using speaker headset wires. As the Warden puts it, "[w]hen Mario began choking and strangling Natalie, Ingram knew that Mario hadn't yet obtained money from the victim, as he told Ingram he was going to do." From this "a jury could reasonably infer that Ingram–having been told by her cousin of his intent to obtain money from the victim–having changed seats with him at his request, then witnessing him begin to choke and strangle the victim–was well aware of his larcenous intent, which was formed prior to the murder." In other words, there could be little doubt that by the time Mario began choking the victim, Ingram was aware not only of Mario's larcenous intent but of his murderous intent as well. And by her actions of changing seats,[5] putting the car in park, and relocking the car door, "[a] rational trier of fact could

_____

[5]Ingram complains that neither the Michigan Court of Appeals nor the district court acknowledged that the changing of seats did not occur immediately before the homicide. Had the exchange occurred much earlier than the murder, an inference could have been drawn that it was not related to the murder. However, Ingram's statement also does not indicate exactly when the exchange occurred. Thus, rather than dispelling the notion that the act was unrelated to the murder, it is still fair game.

easily infer from this action that [Ingram] actively assisted Mario Ingram not only with the underlying larceny, but also with the fatal assault as well." *Ingram v. Stovall*, 2008 WL 2605078, at *5. Thus, the district court did not err in concluding that the state courts reasonably applied *Jackson* to the facts of Ingram's case.[6]

Ingram claims the Michigan Court of Appeals failed to address the issue of formation of intent to commit the larceny at the time of the homicide. To the contrary, the Michigan Court of Appeals held that a rational trier of fact could have concluded beyond a reasonable doubt that Ingram assisted Mario "with knowledge that Mario intended to kill the victim during the course of a larceny." *People v. Ingram*, 2002 WL 31956964, at *1. It relied specifically on the fact that "Stacey Ingram stated that she knew that Mario Ingram was going to ask the victim for money, and changed seats with him before the fatal assault." *Id.*

Ingram also argues that the district court's finding that the larceny occurred "immediately" after the murder is not supported by the record and that the court thus erred in finding that she had larcenous intent during the murder. *See Ingram v. Stovall*, 2008 WL 2605078, at *5. Furthermore, Ingram claims that she took the wallet only upon Mario's instruction, gave him the $41, and received only $1 in turn.

Ingram's confession does not state that the wallet was taken "immediately" upon Grillo's death. It is also uncontroverted that Mario directed her to retrieve the wallet. But neither of these

---

[6]The cases Ingram cites are not binding and unpersuasive in any event. First, both *Fuller v. Anderson*, 662 F.2d 420, 424 (6th Cir. 1981), and *Hopson v. Foltz*, 818 F.2d 866 (6th Cir. 1987) (per curiam) (table disposition) are pre-AEDPA cases, and at most reaffirm that "mere presence" at the scene does not establish guilt. The other cases cited for the proposition that the evidence was at most "speculative" turn on different facts. *See, e.g., Newman v. Metrish*, 543 F.3d 793, 796-97 (6th Cir. 2008) (and cases discussed therein). And in this case, most of the state's case was based on Ingram's own damaging admissions to the police.

facts alters the conclusion that the state court acted reasonably in applying the *Jackson* standard in concluding that the larcenous intent was formed prior to or during the murder. First, the state court did not refer to the fact that the wallet was taken "immediately" after the murder. The timing of the wallet's retrieval is easily explained by the fact that immediately after the murder, Mario and Ingram were trying to figure out what to do with Grillo's daughter and then disposing of Grillo's body. The fact that Mario instructed Ingram to get the wallet simply does not establish that she lacked an intent to aid and abet in the larceny at the time of the murder. Moreover, Ingram's confession reveals she understood Mario's nefarious intent at the outset. Her comment about Mario's intent to ask for money was in response to the specific question of whether "anything [was] said about hurting Natalie." Thus, the "record evidence . . . reasonably support[s] a finding guilt beyond a reasonable doubt" on the element of larcenous intent prior to or during the murder. *See Jackson*, 443 U.S. at 318.

In sum, we cannot say, on habeas review, that the state appellate court's determination that a rational trier of fact could have found the element of intent to commit larceny was unreasonable.[7]

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

---

[7]The fact Mario was not convicted of felony murder does not alter this conclusion. Under Michigan law, "[c]onviction of the principal is [not] necessary to charge the accessory." *People v. Laine*, 187 N.W.2d 505, 506 (Mich. Ct. App. 1971) (per curiam) (citations omitted); *People v. Smith*, 260 N.W. 911, 914 (Mich. 1935) (holding that effect of Michigan statutory provision abolishing distinction between accessory and principal (currently Mich. Comp. Laws § 767.39) "is to permit the prosecution of one who aid and abets, without regard to the conviction or acquittal of one who, under the common law, would have been called the prinicipal"). *See also Standefer v. United States*, 447 U.S. 10, 20 (1980) (interpreting 18 U.S.C. § 2); *id.* at 16 n.9 (noting that Michigan statute is similar to federal statute). The reality that Ingram serves a life sentence for her aiding-and-abetting role while Mario–the person who carried out the killing–will obtain release after forty to sixty years in prison does not change things. *See People v. Ingram*, 2002 WL 31956964, at *1 (Mich. Ct. App. Dec. 20, 2002). Any disparity in sentencing at this point is a matter for the governor to consider in exercising her clemency powers.

### III. Conclusion

For the foregoing reasons the judgment of the district court is **AFFIRMED**.